**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Lester Leroy HUMMER, Defendant–Appellant.**

No. 89–5454.

United States Court of Appeals, Fourth Circuit.

Argued June 8, 1990.

Decided Oct. 17, 1990.

As Amended Oct. 25, 1990.

Alan Hideto Yamamoto, Fairfax, Va., for defendant-appellant.

Geoffrey Robert Brigham, Sp. Asst. U.S. Atty., Alexandria, Va., argued (Henry E. Hudson, U.S. Atty., Lawrence J. Leiser, Asst. U.S. Atty., William G. Otis, Asst. U.S. Atty., Alexandria, Va., on brief) for plaintiff-appellee.

Before WIDENER and WILKINS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINS, Circuit Judge:

Lester Leroy Hummer appeals his convictions of interfering with commerce by threats, 18 U.S.C.A. § 1951 (West 1984), traveling interstate in aid of racketeering enterprises, 18 U.S.C.A. § 1952 (West Supp.1990), threatening to tamper with consumer products that affect interstate commerce, 18 U.S.C.A. § 1365(d) (West 1984), and mailing threatening communications, 18 U.S.C.A. § 876 (West 1976). He contends that evidence seized in a warrantless search of his truck should have been suppressed because his consent to search the vehicle was not freely and voluntarily given. Alternatively, he claims that he was arrested without probable cause prior to the search; therefore, evidence obtained during his detention, including the evidence seized during the search of his truck, should have been suppressed because the search was not sufficiently attenuated from the tainted arrest. Asserting that the district court improperly applied and departed from the sentencing guidelines, Hummer also appeals his sentence. We affirm.

I.

From February to April 1989, Hummer, an inventor of tamper-resistant consumer product lids, sent seven extortion letters to Coca–Cola threatening to poison its products with cyanide. In one letter, signed "deadly serious," Hummer stated that he was a "master[ ] in make-up"; another described in detail the method Hummer would use to penetrate and poison Coca–Cola's products. The method Hummer described was tested extensively by Coca–Cola and found by the district court to be not only feasible but also difficult to detect. Coca–Cola spent over $341,000 "in responding to the extortion threat." The last extortion letter demanded that the chief executive officer of Coca–Cola fly to Dulles International Airport on April 15, 1989, drive to a remote cul-de-sac near a thickly wooded location, and at 7:00 p.m., place $2,000,000 in a hole under a pine tree.

The FBI confirmed the existence of the location, the pine tree, and the hole and began surveillance of the drop site. At 6:15 p.m. on April 15, 1989, in a drizzling rain, FBI Agents William Bray and William Harris Christian, Jr. observed a man approaching the drop site from the woods. The man, wearing a fake beard, a white cap, a light colored shirt beneath a blue sweatshirt, blue pants, and white tennis shoes, spotted Agent Bray and ran back into the woods. Both Bray and Christian gave chase but were unable to overtake the man. Christian soon returned to the surveillance site and remained there.

Approximately ten minutes later, Christian saw Hummer approaching the drop site from the same general vicinity in which he had earlier pursued the fleeing man. Hummer was wearing a blue cap, a red jacket, torn blue jeans, and white tennis shoes. When Hummer saw Christian, he suddenly veered to his left, and walked parallel to the drop site away from the agent. Christian, believing Hummer may have been the first man's accomplice, drew his pistol and commanded, "Freeze!" Hummer ignored the command and continued to move away from the agent. After

Christian gave a second command, Hummer stopped.

Christian identified himself and asked Hummer about his identity and his purpose for being in the woods. Hummer identified himself and explained that he had been jogging. Shortly thereafter, Bray, who had not been able to apprehend the fleeing man, transmitted by radio a description of the man to Christian. Overhearing the transmission, Hummer said, "Oh, that gentleman ran past me in the woods a few minutes ago." When Christian requested that Hummer open his jacket, he observed a blue sweatshirt and a light colored shirt underneath. Christian, realizing that Hummer's attire closely matched that of the fleeing man, concluded that Hummer was the same person observed fleeing earlier. Bray returned to the surveillance site and placed handcuffs on Hummer.

The agents escorted Hummer to a government vehicle and advised him of his *Miranda* rights. Senior Agent Philip J. Rendin met them at a nearby intersection and placed Hummer into his vehicle where he informed Hummer that he was not under arrest, removed the handcuffs, and began questioning him. After Hummer said that he had parked a 1978 Ford pickup truck in the vicinity of the drop site, Rendin asked him for permission to search it. Rendin explained to Hummer that it was necessary that his consent be "free and voluntary ..., that he had the right to refuse to have a search done of his vehicle and a right to have [Rendin] go get a search warrant if he wanted." Hummer agreed to allow the FBI to search his truck provided he could be present. Because he also agreed to submit to a polygraph examination, Rendin and Hummer did not proceed immediately to the truck, but instead went to the FBI's Washington field office.

At the office, Hummer read rights and consent to search forms, stated that he understood the forms, but declined to sign them. Hummer then changed his mind and refused to take a polygraph examination. Several hours later, Rendin asked Hummer if he was still willing to consent to a search of his truck and presented another consent

to search form for his signature. Hummer again declined to sign the form, but negotiated with Rendin over its wording and content. Pursuant to Hummer's suggestions, Rendin wrote a consent agreement by hand, changing the wording of the consent form and adding a provision for Hummer to attend the search. Hummer signed the agreement in which he consented to a search of his truck. The agreement stated that Hummer's written permission was given "voluntarily and without threats or promises of any kind." During the search, FBI agents seized, among other items, prototypes of and patent documents relating to Hummer's tamper-resistant bottles and caps for consumer products.

Prior to his trial Hummer filed a motion to suppress physical evidence and statements obtained from him incident to his arrest. The district court denied the motion. The court found that, at the point Christian noticed the similarity between the clothing of Hummer and the clothing of the man who fled into the woods, Christian had probable cause to arrest Hummer and that Hummer freely and voluntarily gave his consent for the search. The evidence was introduced at Hummer's trial and a jury convicted him of all counts.

## II.

### A.

It is well-settled that a person may waive the fourth amendment's warrant requirement by consenting to a warrantless search by law enforcement officers. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). The government bears the burden of proving the consent was voluntary, *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968), and the district court must look to the totality of the circumstances surrounding the consent in determining whether it was voluntarily given. *Schneckloth*, 412 U.S. at 248–49, 93 S.Ct. at 2058–59. The determination that a defendant has voluntarily consented to a search is a finding of fact that will be upheld on appeal unless the finding of the district court is clearly erroneous. *United*

*States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990).

The record supports the finding that Hummer voluntarily consented to the search of his truck. Although Agent Rendin stated at one point that a search warrant might be sought, Hummer was advised several times orally and in writing of his right to refuse the search. Hummer stated that he understood this right. Furthermore, he had no compunction against asserting it as a bargaining chip in his negotiations with Rendin.

The fact that a search warrant was mentioned "does not necessarily constitute a coercive factor negating consent." *United States v. Vasquez,* 638 F.2d 507, 528–29 (2d Cir.1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620, 454 U.S. 847, 102 S.Ct. 165, 70 L.Ed.2d 135, 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981); *accord United States v. Dennis,* 625 F.2d 782, 793 (8th Cir.1980); *cf. United States v. Talkington,* 843 F.2d 1041, 1049 (7th Cir. 1988) (agent's threat to obtain a search warrant should be addressed as one factor under the totality of the circumstances test). Based on the totality of the circumstances, the finding that Hummer voluntarily consented to the search was not clearly erroneous.

### B.

In the alternative, Hummer contends that even if his consent were voluntary, the evidence should have been suppressed because the FBI did not have probable cause to arrest him. Hummer argues that the illegal arrest tainted his consent to search the truck. Because we find that his arrest was supported by probable cause, we need not address the issue of whether the consent was sufficiently voluntary to purge the taint of the illegal arrest. *See United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976).

"A finding of probable cause to arrest is proper when 'at the time the arrest occurs, the facts and circumstances within the offi-

cer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense.' " *United States v. Garcia,* 848 F.2d 58, 59–60 (4th Cir.), *cert. denied,* 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988) (quoting *United States v. Manbeck,* 744 F.2d 360, 376 (4th Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).

Hummer concedes that Agent Christian possessed the authority under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to stop and frisk him when he was observed approaching the drop site. During this brief investigative stop, Hummer made several suspicious statements and opened his jacket to reveal clothing similar to that worn by the individual previously observed fleeing from the agents. We are persuaded that a combination of factors—Hummer's suspicious statements, the similarity of his clothing to that of the person observed earlier, his approach to a remote drop site in dreary weather conditions at the approximate time of a scheduled extortion drop, and his sudden veering away upon observing Christian—provided Christian with probable cause to arrest Hummer.

### III.

Because the offenses were committed after November 1, 1987, Hummer's sentence is governed by the Sentencing Reform Act of 1984, 18 U.S.C.A. §§ 3551, *et seq.* (West 1985 & Supp.1990), and the Sentencing Guidelines promulgated by the United States Sentencing Commission.[1] Hummer's offenses were grouped pursuant to U.S.S.G. § 3D1.1. Under this section and section 3D1.3, the offense level of the group is calculated by determining the adjusted offense level for the most serious

---

1. All references are to the October 15, 1988, version of the *Guidelines Manual.*

count within the group. The most serious count of which Hummer was convicted, extortion (18 U.S.C.A. § 1951), had an offense level of 23. This results from a base offense level of 18, section 2B3.2, enhanced by section 2B3.2(b)(1) that states that if an extortion amount exceeding $2,500 is demanded, the base offense level should be increased according to a table in section 2B3.1. Because the extortion demand was at least $1,000,001 but not more than $5,000,000, the base offense level was increased by five levels. Also, finding that Hummer used a special skill to significantly facilitate the commission of his offenses, the district court increased this offense level by two, resulting in an adjusted offense level of 25.[2] *See* U.S.S.G. § 3B1.3. An offense level of 25, combined with criminal history category III, resulted in a Sentencing Guidelines range of 70–87 months. The district court granted the government's request to depart above the Sentencing Guidelines range and sentenced Hummer to 151 months. The court grounded its departure on two Commission-identified factors: (1) property damage and loss, U.S.S.G. § 5K2.5; and (2) public welfare, U.S.S.G. § 5K2.14.

Hummer contends the district court improperly applied the Guidelines. He asserts the court erred when it increased his offense level by two levels for use of a special skill pursuant to U.S.S.G. § 3B1.3 and when it departed from the Sentencing Guidelines range pursuant to either section 5K2.5 or 5K2.14.

### A.

■ Section 3B1.3 states in part: "If the defendant ... used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The commentary to section 3B1.3, note 2, states that " '[s]pecial skill' refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots,

lawyers, doctors, accountants, chemists, and demolition experts." Because the determination of whether Hummer possessed a special skill that facilitated the commission of the crime is primarily factual, we review the findings of the district court to determine if they are clearly erroneous. *See United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir.1989).

Hummer contends that his ability to tamper with consumer products does not constitute a special skill within the meaning of the Guidelines. He points out that he did not acquire his skill through substantial education, training, or licensing, and that his skill is distinguishable from the examples given in the commentary to section 3B1.3. In determining that this section applied, the court noted that Hummer was an inventor who had obtained patents for his inventions and had "through life's experience obtained the special ability to tamper with consumer products." The commentary to section 3B1.3 states that a special skill "usually" requires substantial training which implies that substantial training is not a mandatory prerequisite to making a special skills adjustment. Furthermore, the list of examples given in the commentary is obviously not exhaustive. Thus, we agree with the conclusion of the district court that Hummer's special ability to tamper with consumer products, which certainly is not an ability possessed by members of the general public, constitutes a special skill within the meaning of section 3B1.3.

■ Alternatively, Hummer asserts that even if he has a special ability, it did not significantly facilitate the commission of these offenses. This argument, however, overlooks the fact that in his extortion letters Hummer described in detail the method by which he intended to poison Coca–Cola products. The fact that he had indeed perfected a feasible system of secretly penetrating Coca–Cola's products gave his extortion threats a high degree of credibility and increased the chances that Coca–Cola would comply with his demands. Based on

---

**2.** Because Hummer's offenses comprised only one group or unit, his combined offense level was also 25. *See* U.S.S.G. § 3D1.4.

these facts, we cannot say that the finding of the district court was clearly erroneous.

### B.

Hummer also challenges the decision of the district court to impose a sentence of imprisonment greater than the maximum specified in the applicable Guidelines range. An offense level of 25 combined with criminal history category III, the category indisputably applicable to Hummer, produced a Sentencing Guidelines range of 70–87 months. The district court imposed a sentence of 151 months, finding that Hummer's conduct was equivalent in seriousness to that of a level 30, category III defendant. Hummer contends that an upward departure was not warranted because the aggravating factors cited by the district court were adequately considered by the Sentencing Commission in the Guidelines applicable to him. In any event, Hummer argues, the amount of departure was unreasonable.

We review departures from the applicable Sentencing Guidelines range under a multi-part test of "reasonableness" derived from our reading of 18 U.S.C.A. § 3742 (West 1985 & Supp.1990) in conjunction with 18 U.S.C.A. § 3553(b) (West Supp. 1990). *United States v. Summers*, 893 F.2d 63 (4th Cir.1990). Under this test, we first examine *de novo* the specific reasons cited by the district court in support of its sentence outside the Guidelines range to ascertain whether those reasons encompass factors "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C.A. § 3553(b) (West Supp.1990). If the sentencing court identified one or more factors potentially warranting departure, we apply a clearly erroneous standard and review the factual support in the record for those identified circumstances. Upon ascertaining that there is an adequate factual basis for the factors, we apply an abuse of discretion standard to determine if, on balance, the cited departure factors are of sufficient importance in the case such that a sentence outside the Guidelines range "should result." *Id.* Similarly, we apply an abuse of discretion standard to determine if the extent of departure was reasonable.

Applying this test to the facts of this case and the reasons articulated by the district court in support of its departure decision, we conclude that the court properly identified aggravating circumstances warranting an upward departure. The court principally based its departure on two factors that it felt were not adequately reflected in the Guidelines: (1) costs incurred by Coca–Cola in responding to Hummer's extortion threats, and (2) the grave threat to public health and safety posed by the defendant's plot. We examine these factors in turn.

### 1.

The district court accepted the government's contention that the $341,489 expended by Coca–Cola in responding to Hummer's extortion letters and tampering threats constituted a property damage factor not adequately taken into account by the Guidelines for either extortion (U.S.S.G. § 2B3.2), or threatened tampering with consumer products (U.S.S.G. § 2N1.2). The district court concluded that the policy statement to section 5K2.5 specifically recognized the propriety of an upward departure in cases such as this.[3] We agree, although we believe the district court may have placed more emphasis on this particular aggravating circumstance than we do.[4]

Commentary to the guideline for threatened consumer product tampering, section 2N1.2, provides additional support for an

---

**3.** U.S.S.G. § 5K2.5, p.s., provides:

> If the offense caused property damage or loss not taken into account within the guidelines, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent to which the harm was intended or knowingly risked and on the extent to which the

harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction.

**4.** During the sentencing proceeding the district judge stated, "[T]he property loss alone is sufficient to bring me to the level that I am now going to sentence the defendant."

upward departure based upon economic loss. Specifically, application note 2 to that guideline states that "[i]f death or bodily injury, extreme psychological injury, or *substantial property damage or monetary loss resulted,* an upward departure may be warranted. *See* Chapter Five, Part K (Departures)." (Emphasis added.) The district court found that Coca–Cola incurred a substantial monetary loss as a result of Hummer's threatened tampering scheme, a finding that is not clearly erroneous.

Hummer argues, however, that notwithstanding the substantial expenditures by the victim, the Guidelines already take into account the possibility of losses of that magnitude and, therefore, departure based upon that factor is unwarranted. He notes that the broad ranges in the table under U.S.S.G. § 2B3.1 [5] would effectively "swallow" the entire sum of Coca–Cola's asserted expenditures without any effect on the applicable Guidelines range had they constituted an additional extortion demand instead of monetary expenditures. Hummer's argument in this regard has some force, although we believe it conveniently sweeps away the reality that Coca–Cola incurred actual expenses in excess of $341,-000 in an effort to analyze the feasibility of the tampering method he threatened to use. Hummer's argument is more pertinent to the extent of a departure than to the appropriateness of one.

We therefore agree with the district court that Coca–Cola's substantial expenditures constitute an aggravating factor not adequately encompassed in either the threatened tampering or extortion guideline and that this factor warranted an upward departure. We turn next to an examination of the other aggravating circumstance cited by the district court before considering the reasonableness of the extent of departure.

▇ The district court also determined that an upward departure was warranted because "[t]he defendant's plot presented a grave threat to public safety and health." The court found support for its decision in the Commission's departure policy statements. In particular, the court cited U.S.S.G. § 5K2.14, p.s., which states that "[i]f national security, public health, or safety was significantly endangered, the court may increase the sentence above the guidelines range to reflect the nature and circumstances of the offense."

The offense conduct guidelines applicable to the counts of which the defendant was convicted either directly, or indirectly through cross reference from other guidelines, involve U.S.S.G. § 2B3.2, the guideline applicable to extortion by force or threat of injury. The issue is whether this guideline adequately takes into consideration the expansive threat to public health and safety found by the lower court to have resulted from Hummer's conduct. In accord with the district court's determination, we hold that it does not. Therefore, threat to public health and safety is an aggravating circumstance that may warrant an upward departure in a case of this nature.

Application note 2 to U.S.S.G. § 2B3.2 provides an indication of the range of extortionate threats the Sentencing Commission considered to be within the "heartland" of the conduct covered by this guideline. The note states:

This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as "pay up or else," or a threat to cause labor problems, ordinarily should be treated under this section.

---

5. U.S.S.G. § 2B3.2(b)(1), applicable to extortion by threat of injury, requires the offense level be increased according to the table in section 2B3.-1.

From the language of this note [6] a reasonable inference can be drawn that the Commission contemplated extortion threats to harm one or a few persons, to damage property, or to economically injure or ruin a business enterprise. Hummer's extortion threats went far beyond this. He portended, and was ready and able to carry out, a scheme of mass poisoning that potentially endangered the lives of thousands of persons who might consume Coca–Cola beverages. In our view, this was an aggravated threat to public health and safety "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," 18 U.S.C.A. § 3553(b) (West Supp.1990), that could justify a sentence above the guidelines range.

The district court found that Hummer's threatened tampering/extortion scheme was a "highly unusual case" that, because of the defendant's "remarkable skills" and planning, "presented a grave threat to public safety and health." The court further noted that pursuant to Hummer's intended tampering scheme "poison would have been randomly placed in Coca–Cola products causing injury, death, and hysteria." These factual findings are not clearly erroneous.

2.

■ Having determined that both aggravating factors cited by the district court properly warrant a departure, we next consider the substantiality of these factors to determine whether the district court abused its discretion in imposing a sentence above the guidelines range and, if not, whether the sentence imposed is reasonable. As we have noted, we find some merit in Hummer's contention that the economic loss sustained by Coca–Cola, when viewed in relation to the extortion demand, may have been overemphasized by the district court. Nevertheless, we are prepared to grant that aggravating factor some substantiality in supporting an upward departure.

With respect to the threat to public health and safety, Hummer also contends that the extent of the departure by the sentencing judge was unreasonable. Specifically, Hummer argues that treating his threatened tampering conduct as if it were a level 30 offense is unreasonable, since had he been convicted of tampering or attempted tampering and sentenced under section 2N1.1, his offense level would have been 25.

■ The analytical approach that Hummer employs, using other analogous guidelines provisions to guide the reasonableness of a court's departure decision, is one with which we generally agree. As several other circuits have noted, under the Sentencing Reform Act, an upward departure sentence imposed on a defendant ordinarily should not exceed the sentence that would result under the guidelines if the defendant actually had been convicted of the analogous conduct.[7] While we agree that the

---

**6.** For the purpose of determining whether the Commission adequately considered conduct that may serve as a basis for departure, our inquiry, and that of the sentencing judge, is limited to the words of the sentencing guidelines, policy statements, and commentary. 18 U.S.C.A. § 3553(b) (West Supp.1990). Reasonable inferences may be drawn from that language, but we may not concern ourselves with background information to shed light on the scope of conduct covered by a particular guideline.

**7.** *See, e.g., United States v. Kim,* 896 F.2d 678, 685 (2d Cir.1990) (multiple count analysis of U.S.S.G. §§ 3D1.1–3D1.5 provides structure for determining appropriate amount of departure based upon acts of misconduct outside counts of conviction); *United States v. Landry,* 903 F.2d 334, 340–41 (5th Cir.1990); *United States v. Fer-*

ra, 900 F.2d 1057, 1062 (7th Cir.1990) (approving analysis based upon analogy to other guidelines); *United States v. Shuman,* 902 F.2d 873 (11th Cir.1990) (reference to analogous guidelines provisions appropriate in determining reasonableness of departure, although mathematical precision not required). While we approve of this approach to measure the reasonableness of upward departures, we do not mean to suggest that district courts necessarily must force every aggravating factor through the guidelines structure to assess its proper, incremental value as a sentence enhancement. The departure standard of reasonableness does not demand an overly rigorous, mathematical approach. It does demand, however, continued cognizance of the guidelines in order to prevent the bounds of reasonableness from being exceeded. *See United States v. Diaz–Villafane,* 874 F.2d 43, 51–52

 
scope of the United States Sentencing Guidelines should be considered, we are not prepared to accept Hummer's conclusion that the sentence imposed in this case exceeds the bounds of reasonableness, particularly under the abuse of discretion standard applicable to this aspect of departure analysis.

Hummer's egregious conduct involved a "degree" of threat to public health and safety that exceeds the "heartland" of cases U.S.S.G. § 2N1.1 addresses. Importantly, that guideline includes no enhancement for extortion, a substantial aggravating factor present in this case. The guidelines contain no language to compel a conclusion that the Sentencing Commission intended the base offense level of 25 in section 2N1.1 to encompass threatened mass poisoning of a widely consumed beverage product accompanied by extortion and economic loss, and accompanied by the ability to carry out the threat undetected. In view of this combination of aggravating circumstances found by the district court to be present, we cannot say that the 151-month sentence imposed is unreasonable.

### 3.

 Finally, we consider whether the fact that we may have attached different weight to the respective aggravating factors than did the district court should make any difference in our result.[8] We believe that it does not. Our task under 18 U.S.C.A. §§ 3742(e) and (f) in reviewing upward departures is a "bottom line" one of determining whether the particular sentence imposed is unreasonable, "having regard for—(A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and (B) the rea-

sons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c)." 18 U.S.C.A. § 3742(e)(3) (West Supp.1990). It is of no consequence that an appellate court may view various factors warranting departure somewhat differently from the district court when the crux of the decision is whether the departure is reasonable. After reviewing the factors justifying a departure as a whole, an appellate court is constrained to defer to the discretion exercised by the sentencing judge unless that discretion was abused. Finding no abuse, we affirm.

AFFIRMED.

---

(1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).

**8.** We note that several circuits have held that remand is necessary in a case in which the district court relied on an improper departure factor. *See, e.g., United States v. Hernandez-Vasquez,* 884 F.2d 1314, 1315–16 (9th Cir.1989) (per curiam); *United States v. Zamarripa,* 905 F.2d 337, 342 (10th Cir.1990). Other circuits have held that a departure sentence may be affirmed so long as one or more factors exist that properly support departure and the amount

of departure is reasonable. *See, e.g., United States v. Franklin,* 902 F.2d 501, 508 (7th Cir. 1990); *United States v. Rodriguez,* 882 F.2d 1059, 1068 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990). We believe that the latter rule is more consistent with the "reasonableness" standard of departure under 18 U.S.C.A. § 3742. However, we need not resolve that issue here because we conclude that both of the factors relied upon by the district court properly may support an upward departure.