UNITED STATES of America,
Plaintiff–Appellee,

v.

Stephen PALINKAS,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Kenneth Michael KOCHEKIAN,
Defendant–Appellant.

Nos. 90–5086, 90–5090.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1991.
Decided June 26, 1991.

William C. Ingram, Jr., Floyd, Greeson, Allen & Jacobs, Greensboro, N.C., for defendant-appellant Palinkas.

Charles A. Lloyd, Lloyd & Lloyd, Greensboro, N.C., for defendant-appellant Kochekian.

Michael Francis Joseph, Asst. U.S. Atty., argued (Robert H. Edmunds, Jr., U.S. Atty. and Richard L. Robertson, Asst. U.S. Atty. on brief), Greensboro, N.C., for plaintiff-appellee.

Before HALL, Circuit Judge, HILL, Senior Circuit Judge of the Court of Appeals for the Eleventh Circuit, sitting by designation, and BOYLE, District Judge for the Eastern District of North Carolina, sitting by designation.

HILL, Senior Circuit Judge:

These cases involve interpretation and application of the United States Sentencing Guidelines. Appellants Kenneth Kochekian and Stephen Palinkas were indicted along with four other codefendants in a 62 count indictment. (Palinkas was indicted on only one count, while Kochekian was indicted on all 62 counts.) The counts involved charges of conspiracy to commit wire fraud, wire fraud, conspiracy to transport money obtained by wire fraud, and transportation of money obtained by wire fraud. The charges stemmed from an elaborate scheme by members of Kenyon Home Furnishings ("Kenyon"), a North Carolina corporation, to deceive a lender. The scheme involved a revolving line of credit with a New York bank, Bankers Trust Commercial Corporation ("BTCC"), under which the bank agreed to provide financing based on Kenyon's accounts receivable and inventory. Kenyon falsely created or greatly exaggerated its accounts receivable, in part by creating several sham corporations, to give the appearance to the bank of legitimate accounts. Kochekian was the president and chief executive officer of Kenyon, and Palinkas was the credit manager. Palinkas pled guilty to the one count, while Kochekian pled guilty to six

counts. Palinkas and Kochekian appeal their sentences. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Background relevant specifically to Kochekian*

The scheme to obtain money from BTCC was highly sophisticated. The chief financial officer of Kenyon created a computer program to make random assignments of payments toward and increases in apparent accounts receivable. Under the direction of Kochekian, the financial officer also set up false bank accounts in the names of false Kenyon suppliers. The money loaned to Kenyon by the bank was shown as being paid out to these false suppliers for inventory (thus apparently increasing that asset for greater borrowing), and the money put in the false accounts was then funneled back into Kenyon as payments from false Kenyon customers toward accounts receivable (thus reducing apparent accounts receivable, making possible the creation of additional false accounts receivable by the computer program and thus even more borrowing). The scheme also entailed the other details necessary to achieve the fraud, including: counterfeiting checks and check stubs to create the illusion of payment of invoices; fabricating false confirmations of auditing inquiries; creating false merchandise labels to inflate the inventory; and providing day-to-day reports to the bank.

In all, BTCC loaned Kenyon a total of $107,847,841 between April, 1988, and May, 1989, based on the false and misleading information.[1] Kenyon paid back over $73 million, and BTCC realized about another $2 million from the liquidation of certain Kenyon properties. The court concluded that the amount of loss to the bank was $32 million.

Kochekian was well compensated. Kochekian's salary from Kenyon was $250,000/yr., and in June of 1990 he was supposed to be paid $2.4 million in fixed bonuses. During the period of the fraud, Kochekian also enjoyed fringe benefits such as luxury cars (a Rolls Royce, Porsche, and Maserati), a country club membership, life insurance, and a health plan. Kochekian also profited, along with a partner, about $4,000/month from renting the manufacturing facility to Kenyon, and he and his wife profited about $3,500/month from renting the showroom to Kenyon.

Kochekian pled guilty to six counts. One count charged him with violating 18 U.S.C. § 371[2] by conspiring to commit wire fraud[3] and to transport money in excess of $5000 obtained by fraud.[4] The other counts charged him with transporting money obtained by fraud and aiding and abetting such transportation, in violation of 18 U.S.C. §§ 2[5] and 2314. The guilty plea resulted from a plea bargain with a five

---

1. The falsifying of inventory and accounts receivable actually dates back well beyond 1988. Kochekian founded Kenyon in 1975, and during Kenyon's existence several financial institutions provided lines of credit to Kenyon based on false and misleading information.

2. 18 U.S.C. § 371 (1988) reads in part as follows: If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be [in violation of section 371].

3. Wire fraud is governed by 18 U.S.C. § 1343 (1988):
 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations,

or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [violates section 1343].

4. Transportation of money obtained by fraud is governed by 18 U.S.C. § 2314 (1988), which provides in part:
 Whoever transports, transmits or transfers in interstate ... commerce any ... money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud [violates section 2314].

5. 18 U.S.C. § 2 (1988) provides in part:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

year "cap" on the sentence. The district court found Kochekian's Guidelines range to be 37 to 46 months, based on an offense level of 21.[6] The court departed upward to the five year limit contained in the plea bargain and imposed a 60 month sentence. According to the district court:

> The Court does find that the loss in this case is more than six times the five-million-dollar figure contained in the guidelines, and that further the offense involves an aggravation of a degree not adequately considered by the guidelines. The Court also notes that in the plea agreement the defendant was made aware and specifically noted the guideline provisions as well as the language of Title 18, United States Code Section 3553(b), and the plea agreement, which the Court has accepted, provides for a five-year cap on any sentence imposed....
>
> The Court believes that the factors as is set out concerning the size of the fraud, the ongoing nature, the way it was accomplished and the sophistication involved, are such that departure above the guidelines are [sic] appropriate. And therefore, the defendant is committed to the custody of the Attorney General ... for imprisonment for a period of 60 months.

R6-2-46.

### B. *Background relevant specifically to Palinkas*

Kenyon hired Palinkas in September, 1988, at an annual salary of $52,000 (with no fringe benefits), a sum much smaller than Palinkas' other co-conspirators. Prior to his employment with Kenyon, Palinkas aided the conspiracy by accepting and returning counterfeit invoices with out of state postmarks and by traveling to various locations in the United States to set up mail boxes for bogus customers of Kenyon. Apparently, Palinkas was not directly compensated for this work. After being officially employed by Kenyon, Palinkas was directed to, and did, hire attorneys to establish four sham corporations. Palinkas also set up bank accounts for those corporations in different parts of the country. Additionally, at the direction of the vice president, Palinkas posed as president of one of the sham corporations (Valencia Chairs) at a meeting with BTCC's auditors. Palinkas also created mail drops for legitimate Kenyon customers at false locations so that the customers would not see the bank confirmations containing the exaggerated sums they were said to owe to Kenyon. On one occasion, Palinkas even intercepted confirmations mailed by auditors, apparently retrieving them from the United States mail. The vice president testified that Palinkas was not, however, involved with the scheme on a day-to-day basis and that Palinkas did have legitimate duties as credit manager.

Palinkas pled guilty to Count One in the Indictment, charging him with violating 18 U.S.C. § 371 by conspiring to commit wire fraud and to transport money in excess of $5000 obtained by fraud.[7] The district court found Palinkas' total offense level to be 17, with a Guidelines range of 24-30 months.[8] The court rejected a reduction for Palinkas' role in the offense, but sentenced him only to 24 months.

## II. DISCUSSION

### A. *Palinkas should not have received a reduction in his offense level for being a "minimal" or a "minor" participant*

 Palinkas argues that he should have received a reduction in his offense

---

**6.** Because appellants' conduct continued no later than May, 1989, their offense level was determined under the October, 1987, Sentencing Guidelines Manual. Kochekian's offense level of 21 was calculated as follows: base offense level for § 2F1.1 Fraud and Deceit—six; loss greater than $5,000,000—add eleven (§ 2F1.1(b)(1)(L)); offense involved more than minimal planning—add two (§ 2F1.1(b)(2)(A)); Kochekian's leadership role in the offense—add four (§ 3B1.1(a)); adjustment for acceptance of responsibility—subtract two.

**7.** For the text of the statutes relevant to this offense, see footnotes 2-4 above.

**8.** The offense level of 17 was calculated as follows: base offense level for § 2F1.1 Fraud and Deceit—six; loss greater than $5,000,000—add eleven (§ 2F1.1(b)(1)(L)).

level for being a "minor" or "minimal" participant, as defined by U.S.S.G. § 3B1.2. This section provides a four level reduction for "minimal" participation, a two level reduction for "minor" participation, and three levels for an in between role. A defendant seeking a mitigating adjustment under section 3B1.2 must convince the district court of its application by a preponderance of the evidence. *United States v. Gordon*, 895 F.2d 932, 935 (4th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990). Appellate review of a district court determination regarding the defendant's role in the offense is governed by the clearly erroneous standard. *United States v. Daughtrey*, 874 F.2d 213, 218 (4th Cir. 1989). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Downward role in the offense adjustments are aimed at a defendant "who plays a part in committing the offense that makes him *substantially less culpable* than the average participant." U.S.S.G. § 3B1.2, comment. (backg'd) (emphasis added). The reduction for "minor" participants is "intended to cover defendants who are plainly among the least culpable of those involved." U.S.S.G. § 3B1.2, comment. (n. 1). The reduction for "minimal" participants is intended for even less culpable defendants. The commentary specifically states that the reduction for "minimal" participants is intended to be used infrequently. U.S.S.G. § 3B1.2, comment. (n. 2). According to the commentary, this category "would be appropriate, for example, for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." *Id.*

 Palinkas bases his argument for a mitigating role adjustment on his conduct's

having been relatively less culpable than that of any other codefendant. The government does not dispute his relative culpability, and we agree that Palinkas appears to have been less culpable than some others. Nevertheless, he did much. Although the facts may distinguish one participant from another, the distinguishing facts are not necessarily relevant for sentencing purposes. *Daughtrey*, 874 F.2d at 218. Whether a role in the offense adjustment is warranted "is to be determined not only by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable, ... but also by measuring each participant's individual acts and relative culpability against the elements of the offense of conviction." *Id.* at 216. The critical inquiry is thus not just whether the defendant has done fewer "bad acts" than his codefendants, but whether the defendant's conduct is material or essential to committing the offense.

In this case, Palinkas' actions in furtherance of the conspiracy cannot be described as slight; his actions were substantial and important. As already discussed, Palinkas accepted and returned counterfeit invoices with out-of-state postmarks, traveled to various locations in the United States to set up mail boxes for ficticious customers of Kenyon, hired attorneys to establish four sham corporations, and set up bank accounts for those corporations. Palinkas created mail drops for legitimate Kenyon customers at false locations so that the customers would not receive and see the bank confirmations containing the exaggerated sums said to be owed to Kenyon. Significantly, Palinkas even once intercepted confirmations mailed by auditors by retrieving them from the United States mail. Additionally, Palinkas even posed as president of one of the sham corporations in order to dupe the bank's auditors. Palinkas was not "substantially less culpable." Palinkas' activities were clearly material to the conspiracy; they were instrumental in concealing the fraud from the bank, and they were substantial. Under these circumstances, we are not left with "a definite and firm conviction" that the district

court erred. We affirm the sentence of the district court.

### B. *The district court properly departed upward when sentencing Kochekian*

Kochekian challenges the district court's decision to impose a sentence greater than the maximum specified in the applicable Guidelines range. Kochekian contends that two of the aggravating factors—"the on-going nature" and "the sophistication involved"—do not warrant upward departure because those factors were adequately considered by the Sentencing Commission in the Guidelines. Kochekian also contends that a third factor—"the way it was accomplished"—was either encompassed by the first two factors or is too vague. Kochekian next argues that the district court erred in using the fourth factor—"the size of the fraud"—to depart upward because the court did not similarly depart upward as to his codefendants. Finally, Kochekian maintains that even if upward departure because of the size of the fraud was justified, the district court should have departed by analogy to the Guidelines or provided a reason for not doing so.

### 1. *The on-going nature, the way it was accomplished and the sophistication involved*

■ We review the validity of the district court's upward departure under a multi-part test of "reasonableness," as set forth in *United States v. Hummer*, 916 F.2d 186, 192 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991). Under this test, we first make a *de novo* determination of whether the specific reasons cited by the district court are adequately taken into consideration by the Guidelines. *Id.* Second, we review the factual support in the record for the identified circumstances under a clearly erroneous standard. *Id.* Third, "we apply an

abuse of discretion standard to determine if, on balance, the cited departure factors are of sufficient importance in the case that a sentence outside the Guidelines range 'should result.'" *Id.* Last, we utilize an abuse of discretion standard to resolve whether the extent of departure is reasonable. *Id.*

■ Kochekian's challenge to the use of two of the factors—"the on-going nature" and "the sophistication involved"—focuses on the first prong of the test. Kochekian argues that the Guidelines adequately take those factors into consideration. Kochekian contends, for instance, that U.S.S.G. § 3B1.1(a), which provides a four point upward adjustment for being the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, adequately takes into consideration the "on-going nature" of the scheme. As appellant points out, the "on-going nature" refers to the constant day-to-day activity required to maintain the fraud (as reviewed above in section I.A.). Kochekian bases his argument on the statement in Note 3 of the commentary to section 3B1.-1(a) that one factor to consider in determining whether to apply the upward departure for a leadership role is "the nature and scope of the illegal activity." The issue here is not, however, simply whether a section of the Guidelines takes into consideration a particular circumstance; the issue is whether that section *adequately* takes this circumstance into consideration. Application Note 3 lists numerous factors that the court should consider when determining whether to find that the defendant was the organizer or leader of a criminal activity,[9] and the background to the commentary states that it is the Commission's intent that the upward adjustment "should increase with both the size of the organization and the degree of the defendant's responsibility." U.S.S.G. § 3B1.1, comment. (backg'd). It seems, thus, that the Com-

---

**9.** Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation

in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1(a), comment. (n. 3).

mission did not intend for defendants who barely fall within the category of an organizer or leader of a criminal activity to receive the same upward adjustment as defendants who exude the characteristics of a CEO of a criminal activity. Here, Kochekian was the president and chief executive officer of the company used to defraud the lender, and he directed the fraudulent activities. Furthermore, Kochekian was compensated greater than the other participants. Even without the day-to-day nature of the scheme, Kochekian would easily have fallen into the classification of an organizer or leader of a criminal activity. The four point upward adjustment in section 3B1.1(a) does not adequately encompass the "on-going nature" of Kochekian's scheme.

■ We next address section 2F1.-1(b)(2)(A)'s two point increase for an offense involving more than minimal planning. Kochekian argues that this upward adjustment adequately takes into consideration both the "on-going nature" of the scheme and the scheme's sophistication. In so arguing, Kochekian notes that the commentary to the Guidelines states that the "more than minimal planning" adjustment applies to "any case involving repeated acts over a period of time." U.S.S.G. § 1B1.1, comment. (n. 1(f)). We note that the Guidelines' commentary also states that " '[m]ore than minimal planning' means more planning than is typical for commission of the offense in a simple form." *Id.* The Commission considered *planning* in this section of the Guidelines; it did not consider the constant fraudulent activity executed by a defendant. *See United States v. Burns*, 893 F.2d 1343, 1346 (D.C.Cir.), *cert. granted,* — U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990)

(Supreme Court granted certiorari on a different issue).[10] The "on-going nature" cited by the district court does not refer to the planning necessary, but instead, as appellant himself noted, to the fraudulent activity that occurred on a daily basis. We thus conclude that section 2F1.1(b)(2)(A) does not adequately encompass the "on-going nature" of the scheme.

In arguing that the two point upward adjustment for "more than minimal planning" encompasses the sophistication of the scheme, Kochekian also claims that the Guidelines' commentary defining the phrase gives an example of the activity that occurred in his scheme:

In an embezzlement, a single taking accomplished by a false book entry would constitute only minimal planning. On the other hand, creating purchase orders to, and invoices from, a dummy corporation for merchandise that was never delivered would constitute more than minimal planning, as would several instances of taking money, each accompanied by false entries.

U.S.S.G. § 1B1.1, comment. (n. 1(f)). The activity described by the commentary, however, is only a small part of the sophisticated nature of appellant's scheme. As reviewed in section I of this opinion, appellant's scheme not only involved the creation of dummy supplier and buyer corporations, but it also involved the development of a highly complex computer program that made random assignments of payments toward and increases in accounts receivable in order to increase the amount of money available for borrowing from the bank. The scheme also involved the fine details used to conceal the fraud, including counterfeiting checks and check stubs to create the illusion of payment of invoices, creating

**10.** In *Burns,* the defendant was employed by the United States Agency for International Development and diverted government funds to his own pocket over a six year period through the issuance of 53 checks totaling over $1.2 million. 893 F.2d at 1344. The district court departed upward from the 30–37 month range to 60 months. *Id.* In reviewing the departure, the court of appeals concluded that the district court "properly observed that in incorporating a 'more than minimal planning' adjustment into

the Guidelines, the Commission did not consider 'the number of years and the amount of fraudulent transactions ... executed' by a defendant." *Id.* at 1346. The court of appeals also noted that where a defendant has more opportunities to renounce his illegal schemes, departure is warranted. *Id.* In the case *sub judice,* because the fraudulent acts were conducted on a daily basis, Kochekian had continuous opportunities to renounce his illegal scheme.

false merchandise labels to inflate the inventory, creating mail drops for legitimate Kenyon customers at false locations so that the customers would not see the bank confirmations containing requests for verification that the customers owed exaggerated sums to Kenyon, intercepting auditors' confirmations from the United States mail, fabricating false confirmations of auditing inquiries, and even having one member of the conspiracy (Palinkas) pose as president of one of the non-existent corporations at a meeting with the bank's auditors.

The commentary to section 2F1.1 notes that:

> [e]mpirical analyses of current practices show that [one of] the most important factors that determine sentence length [is] whether the offense is ... sophisticated.... The extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness and the dangerousness of the offender, independent of the actual harm. A complex scheme ... is indicative of an intention and potential to do considerable harm. In current practice, this factor has a significant impact.

U.S.S.G. § 2F1.1, comment. (backg'd). Because the Guidelines recognize the importance to a sentence of a sophisticated scheme and the example of the sophistication considered by the Commission does not even approach that of appellant's scheme,

we find that the two point upward adjustment for "more than minimal planning" does not adequately take into consideration appellant's highly sophisticated scheme.[11]

■ Kochekian's criticism of the district court's citation to "the way it was accomplished" has more merit. Kochekian argues that it is difficult to tell what the district judge meant by this factor and that this factor seemingly is covered by "the on-going nature" and "the sophistication involved." The government offers no explanation, and we do not disagree with appellant. Under these circumstances, we cannot say that the Guidelines do not adequately take into consideration "the way it was accomplished." This factor thus cannot support departure. This conclusion, however, does not affect the disposition of this appeal. "A departure is not rendered impermissible merely because the court cites some factors which will not support departure." *United States v. Christoph,* 904 F.2d 1036, 1042 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991).[12] That some factors do not support departure merely goes to the fourth part of the "reasonableness" test set forth in *Hummer:* whether the extent of departure was reasonable. That is, the extent of departure must appear reasonable in light of the permissible factors. As we discuss below at pages 464–465, the extent of departure based on the permissi-

---

11. We note that appellant also argues that where a defendant has received an upward adjustment pursuant to section 3B1.1 for his aggravating role (i.e., organizer, leader, manager, or supervisor) in the offense, the sophistication of the scheme should be ignored because section 3B1.3's two point increase for abuse of a special skill does not apply when the defendant receives an increase pursuant to section 3B1.1. This argument is odd. Were it correct, a defendant guilty of perpetrating a sophisticated scheme could not even receive the two point increase for "more than minimal planning" in section 2F1.1(b)(2)(A). Such a reading of the Guidelines clearly is not what the Commission intended.

We also note that appellant seems to contend half-heartedly that he was not the source of the sophistication because Kenyon's chief financial officer created the computer program, and therefore he should not be saddled with the

scheme's sophistication. Not surprisingly, appellant cites no authority for this proposition. Were we to agree with appellant, a leader of a scheme could escape responsibility for its sophistication by delegating authority; he could avoid an upward adjustment for a very sophisticated scheme simply by hiring others to carry it out. Such a result seems illogical. Furthermore, as one can see from the portion of the commentary quoted in the text, the Guidelines are concerned with the extent to which an *offense* is sophisticated; the Guidelines do not intimate that the particular defendant must himself be the source of the sophistication.

12. *But see United States v. Nuno–Para,* 877 F.2d 1409, 1413–14 (9th Cir.1989) (a case where two of three factors cited by district judge for departure were improper, and the Ninth Circuit opined that sentence must be vacated where a court relies on proper and improper factors).

ble factors is eminently reasonable in this case.

### 2. *The size of the fraud*

■ Kochekian last criticizes the district court's citation to "the size of the fraud." Kochekian's first basis for attacking this justification is that, while Application Note 10 to section 2F1.1 permits upward departure for losses substantially in excess of $5 million,[13] the court cannot use the amount of the loss to depart upward where the court has refused to depart upward on this ground when sentencing the other defendants.[14] According to appellant, a departure on this ground as to him alone violates the Sentencing Commission's stated goal of uniformity. Because this issue presents essentially a legal question, our review is *de novo*. *See Daughtrey*, 874 F.2d at 217.

We disagree with appellant. In listing the objectives that Congress sought to achieve in enacting the new sentencing law, the Sentencing Commission noted that "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for *similar criminal conduct by similar offenders.*" U.S.S.G. Chap. 1, Part A, ¶ 3 at 1.2 (latter emphasis added). The Commission also observed that "Congress

sought *proportionality* in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." *Id.* (emphasis supplied). Kochekian's criminal conduct was not similar to that of his codefendants; his conduct was more egregious than their conduct. It was Kochekian, not the other defendants, who founded Kenyon in 1975. It was Kochekian, not the other defendants, who was president and chief executive officer of Kenyon. It was Kochekian, not the other defendants, who had the final word on the activities of Kenyon. It was Kochekian, not the other defendants, who realized extravagant financial rewards from the scheme. It was Kochekian, not the other defendants, who pled guilty to six counts of the indictment.[15] In sum, Kochekian's conduct clearly makes him the one most responsible for the bank's loans totalling $107,847,841 and the net $32 million loss to the bank, and thus the district court's departure as to Kochekian based on "the size of the fraud" is not error.[16]

Kochekian also argues that even if the district court correctly used the size of the fraud to depart, the court should have determined the extent of departure by departing through analogy to the scale set forth in U.S.S.G. § 2F1.1(b)(1).[17] According to

---

**13.** The highest dollar amount for fraud listed in the 1987 Guidelines was $5 million. According to U.S.S.G. § 2F1.1, comment. (n. 10): "The adjustments for loss do not distinguish frauds involving losses greater than $5,000,000. Departure above the applicable guideline may be warranted if the loss substantially exceeds that amount."

**14.** Of the five codefendants, the district court departed upward based on the size of the fraud only as to Kochekian.

**15.** The greatest number of counts that any other defendant pled guilty to was four (by Pearce). The other three defendants pled guilty to only one count each.

**16.** Kochekian also seems to argue that the fact that he is the most responsible for the loss is already taken into account in the four point increase he received pursuant to U.S.S.G.

§ 3B1.1 for being an organizer or leader, and therefore his responsibility is irrelevant to an upward departure based on the size of the fraud. We cannot agree. Under this theory, the organizer of a large fraud conspiracy could escape responsibility for the size of the fraud by hiring one co-conspirator to be a minor figure in the scheme. Because that co-conspirator would not be really responsible for the excess fraud above the Guideline range and thus would not be penalized for that level of fraud, the organizer could not be penalized for the excess fraud either. Such a result makes little sense in light of Congress' intent that those guilty of differing criminal conduct receive "appropriately different sentences." U.S.S.G. Chap. 1, Part A, ¶ 3 at 1.2.

**17.** We note that a district court may depart from the range in three situations: (1) where the offense committed falls between two different levels of enhancement; (2) where the Guide-

appellant's extrapolation, three new levels would be created, and based on the size of the loss appellant's offense level would increase from 21 to 23.[18] With his criminal history category of I, appellant's Guidelines range would be 46–57 months, the maximum sentence being less than the 60 months he actually received.[19] Although appellant argues that we should review this issue *de novo*, the question is really whether the extent of departure is reasonable and thus is governed by the abuse of discretion standard. *See Hummer*, 916 F.2d at 192.

We need not address whether the district court should have departed through analogy in regard to the fraud size factor because appellant's argument fails to take account of a situation where the district court has also relied on other permissible

factors in departing from the Guidelines. The size of the fraud is only one of several, separate aggravating factors in this case. Even if we were to accept appellant's argument that the district court should have extrapolated when departing based on the fraud factor, the district court was still justified in departing from the Guidelines based on two other factors it cited. Appellant does not argue that, regarding those other two factors, the district court should have departed by analogy, and we cannot say that a departure of three months (the sixty month sentence minus the 57 months that, according to appellant, the fraud factor alone permits) based on the other factors is unreasonable. A departure of another three months is well within the range of departure permitted by those additional factors.[20] The district court did not abuse its discretion.

lines provide specific guidance for departure, by analogy or by other suggestions; and (3) where the aggravating or mitigating factors have not been adequately considered by the Commission. U.S.S.G. Chap. 1, Part A, ¶ 4(b) at 1.7–1.8.

**18.** The levels under the October, 1987, Guidelines were as follows:

| | | |
|---|---|---|
| (A) | $2,000 or less | no increase |
| (B) | $2,001—$5,000 | add 1 |
| (C) | $5,001—$10,000 | add 2 |
| (D) | $10,001—$20,000 | add 3 |
| (E) | $20,001—$50,000 | add 4 |
| (F) | $50,001—$100,000 | add 5 |
| (G) | $100,001—$200,000 | add 6 |
| (H) | $200,001—$500,000 | add 7 |
| (I) | $500,001—$1,000,000 | add 8 |
| (J) | $1,000,001—$2,000,000 | add 9 |
| (K) | $2,000,001—$5,000,000 | add 10 |
| (L) | over $5,000,000 | add 11 |

The three new levels offered by appellant are as follows:
Level (L) ... $ 5,000,001—$10,000,000 ... add 11
Level (M) ... $10,000,001—$20,000,000 ... add 12
Level (N) ... $20,000,001—$50,000,000 ... add 13

**19.** It would appear proper for appellant's sentence to be based on a figure close to the total amount gained by the fraud ($107,847,841) instead of the net loss after the fraud was detected, *see* U.S.S.G. § 2F1.1, comment. (n. 7) (if a probable or intended loss was greater than the actual loss, the larger figure will be used), but we need not discuss this issue. We note, however, that if the amount of "loss" were so calculated and we followed appellant's extrapolation

suggestion, appellant's maximum sentence likely would be greater than 60 months.

**20.** In support of his position on departure, appellant cites *United States v. Pearson*, 900 F.2d 1357 (9th Cir.1990). As that opinion was superseded by *United States v. Pearson*, 911 F.2d 186 (9th Cir.1990), we assume that appellant meant to cite to the latter opinion. *Pearson* does not mandate a result different from that which we reach. In *Pearson*, the defendant pled guilty to eight counts of bank robbery and attempted bank robbery. *Id.* His total offense level was 22, with a Guideline range of 51–63 months. The number of robberies was the specific aggravating circumstance in the case, as U.S.S.G. § 3D1.4 (Determining the Combined Offense Level) did not take account of two of the robberies and the commentary to section 3D1.4 permitted departure where additional offenses resulted in a total of significantly more than five "units." After extrapolating from the scale in section 3D1.4, the Ninth Circuit determined that the sentencing range for the defendant would extend as high as 71 months. The actual sentence the district court had imposed was 120 months—a 49-month difference. The Ninth Circuit concluded that "[t]here may be many other factors justifying results different from those derived by analogy. In this case, however, after considering the factors mentioned by the judge, we conclude that the sentence so greatly exceeds the amount suggested by analogy that the amount of departure is unreasonable." *Id.* at 191.

### III. CONCLUSION

For the foregoing reasons, the sentences imposed on Palinkas and Kochekian by the district court are affirmed.

AFFIRMED.

As one can see, *Pearson* is fact specific. Our facts are different. The size of the fraud is only one of several, separate aggravating factors. Even if one does assume that the maximum sentence based on the size of the fraud should only be 57 months, those additional factors clearly permit departure beyond 57 months. In contrast to *Pearson*, the additional departure in our case is only three months and is plainly reasonable.