993 F.2d 1540
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
William Fitzgerald HARDY, a/k/a Yance, Defendant-Appellant.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Edison James ALBERTY, Defendant-Appellant.
 Nos. 92-5289, 92-5302.
 United States Court of Appeals,
Fourth Circuit.
 Submitted: March 30, 1993
Argued: April 2, 1993
Decided: May 13, 1993
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. William L. Osteen, Sr., District Judge. (CR-91-83-G)
 Argued: Susan Hayes, Greensboro, North Carolina, for Appellant.
 Michael Francis Joseph, Assistant United States Attorney, Greensboro, North Carolina, for Appellee.
 On Brief: Barry S. Stanback, Greensboro, North Carolina, for Appellant. Alberty; John William Totten, II, Winston-Salem, North Carolina, for Appellant Hardy.
 Robert H. Edmunds, Jr., United States Attorney, Greensboro, North Carolina, for Appellee.
 Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 William F. Hardy and Edison J. Alberty were each found guilty of two counts of a multiple count indictment.[1] Hardy was found guilty of Count I, possession with intent to distribute and distribution of cocaine base and cocaine hydrochloride, 21 U.S.C.ss 846 and 841(b)(1)(A), and Count III, possession with intent to distribute cocaine hydrochloride. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Alberty was also found guilty of Count I, and was found guilty of Count VI, possession with intent to distribute cocaine hydrochloride. 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). Alberty appeals on the grounds that: (1) he was improperly denied a reduction of sentence for acceptance of responsibility and for his role as a minor participant; and (2) a pre-trial photo lineup was unduly suggestive and tainted the next day's in-court identification of him. Hardy appeals on the ground that the district court improperly admitted an out-of-court statement made by him. Finding no error, we affirm.
 
 
 2
 * Sometime during the fall of 1988, Jamie "Mo" Williams moved to Greensboro, North Carolina. He shared an apartment there with Ed Richardson. Shortly thereafter, Williams began a cocaine distribution business. Williams recruited other members into the business including Marcus Dixon, Alberty, and Robert Watts who lived next door to him.
 
 
 3
 Packages of cocaine were sent from New York by Williams' supplier via express mail to apartments in Greensboro, including Watts' apartment. Payment for the cocaine was wired back to New York using Western Union money orders. Williams also had packages sent to his place of employment. Packages were delivered until April 1991, when a U.S. Postal Inspector discovered that cocaine was being delivered to vacant apartments. A controlled delivery was set up, and the woman who picked up the package was arrested. Subsequently, other members of the conspiracy were arrested, including Watts, who became the principal witness for the government.
 
 
 4
 Watts testified that Williams told him he had a"white kid who played tennis" who was selling five to six ounces of cocaine per week for him. Joint Appendix (J.A.) at 62, 138. Watts was referring to Alberty who was not a tennis player, but an accomplished racquetball player. Watts further testified that he and Williams received cocaine packages and cut and packaged the cocaine for distribution. Alberty received five to six ounces of cocaine from a package. According to Watts, weekly lunches at Greensboro restaurants were typically held at which time Alberty would pay Williams and receive cocaine. Watts testified that in the spring of 1989, Alberty visited Williams regularly at the apartment staying for only five minutes and then "leave[ing] in a hurry." (J.A. 63).
 
 
 5
 Watts stated that he personally made a delivery of six ounces of cocaine to Alberty at a Greensboro Mall at which time Alberty told him he was "selling pot or cocaine" and wanted to learn from Watts how he could make more money by selling crack cocaine. Watts also stated Alberty told him he was selling five to six ounces of cocaine per week.
 
 
 6
 Watts also testified as to Hardy's involvement in the conspiracy, stating that Hardy began working for Williams in August 1990. Frequently, Watts and Williams travelled to Hardy's house in Kernersville, North Carolina, to drop off cocaine and pick up money. Williams gave Hardy large amounts of cocaine in exchange for money and Hardy went to Williams' apartment once a week to exchange money for cocaine. Watts stated he personally saw Hardy receive eight ounces of cocaine in September 1990 and he heard a message which Hardy left on Williams' telephone answering machine to the effect that he had sold all his cocaine and was ready for more.
 
 
 7
 In an unrelated action, a search warrant was served on Hardy's residence by Kernersville Police Officer Jeffrey Wilhoit on December 30, 1990. A search of the residence yielded thirty-five rocks of "crack" cocaine weighing seven grams. Wilhoit testified that, after Hardy was advised of his Miranda rights, Hardy asked him why he was "doing this to me." (J.A. 859). Wilhoit answered that Hardy was part of an investigation that involved a supplier by the name of Mo-which was Williams' nickname. Hardy said that if Wilhoit had told him that he knew about Mo, he (Hardy) would have told Wilhoit whatever he wanted to know about Mo.
 
 
 8
 Watts testified that he saw Alberty more than twenty times, although at trial he was incorrect in estimating Alberty's height. In court, Watts identified all the defendants on trial, including Alberty. Nickie Sinclair, the girlfriend of one of Williams' roommates, made two identifications of Alberty, one from a four-picture photo spread and one from an in-court voir dire lineup.
 
 
 9
 Sinclair testified that she had seen a young, white male at Williams' apartment on four different occasions from August to November 1990. On the evening before she testified, Sinclair viewed a photo lineup prepared by the government. She correctly chose Alberty from the four photographs; however, pursuant to the district court's instructions, the government did not tell Sinclair that she had correctly identified Alberty.
 
 
 10
 The district court granted defense counsel's request for an in-court voir dire lineup to determine if Sinclair could pick Alberty from three other white males defense counsel brought into court. Sinclair initially identified someone other than Alberty as being the person she had seen on four occasions. Sinclair was then asked to get up from the witness chair and go into the courtroom to identify the person. As she came down to within ten to fifteen feet of Alberty, she stopped and said, "Oh, no, there he is." She then pointed correctly to Alberty. "This is him [she said] they look kind of alike, but this is him [indicating]." (J.A. 472-74, 487). Sinclair explained that she identified the wrong person at first because "[T]hey look alike. Look at their faces." (J.A. 475). She stated that Alberty and the person she initially identified in court resembled each other. The district court agreed. When asked by the district court, and defense counsel whether she used the photo lineup to aid in the courtroom identification, Sinclair stated she had not. The district court entered a finding that the pictures were not unduly suggestive and that Sinclair's in-court identification was not based on her review of the pictures.
 
 II
 
 11
 Alberty argues that the photo lineup shown to witness Sinclair was unduly suggestive in light of Sinclair's preidentification characterization of the man she saw visiting Williams' apartment as a "young, white male" because the other three individuals in the four-picture lineup were plainly older than Alberty.
 
 
 12
 The due process clause protects a suspect against identification procedures which are unnecessarily suggestive and conducive to an irreparably mistaken identification. Manson v. Blathwaite, 432 U.S. 98 (1977). The defendant must first show that the identification procedure was impermissibly suggestive; the court then analyzes whether the identification was nevertheless reliable under the totality of the circumstances. Manson, 432 U.S. at 114-17; United States v. Dorta, 783 F.2d 1179 (4th Cir.), cert. denied, 477 U.S. 905 (1986). The due process inquiry is the same with respect to a photo identification and an in-court lineup: the identification will not be set aside unless it was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377 (1968).
 
 
 13
 We simply cannot agree with Alberty's argument that the pretrial photo lineup was impermissibly suggestive or that the photo lineup, combined with Sinclair's initial misidentification of Alberty in court, caused a very substantial likelihood of irreparable misidentification. As the district court stated, Sinclair was presented four pictures of white males of varying age, "but of a fairly young age." (J.A. 501). Sinclair was not told she had correctly identified Alberty in the photo lineup, nor was she told she would have to identify Alberty in court from a lineup of four individuals chosen by Alberty's counsel. Although Sinclair, from the witness chair, initially misidentified Alberty, upon approaching the four individuals in the lineup, she quickly and clearly stated that she had made a mistake and then correctly identified Alberty. Sinclair explained that the person she initially picked was very similar in appearance to Alberty. We cannot agree that the pretrial photo identification, considered together or separately from the in-court identification, was unduly suggestive.
 
 
 14
 In any event, even if the photo lineup was unduly suggestive, it did not affect the reliability of Sinclair's identification. Sinclair was not told she had correctly identified Alberty. As was previously discussed, Sinclair's in-court identification, once she viewed the participants at close range, was clear and definite. See, United States v. Crews, 445 U.S. 463, 471-473 (1980) (An in-court identification is proper even though an improper earlier pretrial identification occurred so long as the former does not taint the latter.). This being the case, we cannot say that, in the totality of the circumstances, there was a very substantial likelihood of an irreparable misidentification.
 
 III
 
 15
 Alberty next claims he was improperly denied a reduction in sentence because: (1) of his acceptance of responsibility, and (2) his role as a minor participant in the offense. U.S.S.G.s 3E1.1(a) provides that "if the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by two." Application Note 2 to this section provides that the decrease"is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, admits guilt, and expresses remorse."[2] Because Alberty contested matters related to his factual guilt, we cannot say the district court was clearly erroneous in finding that Alberty did not accept responsibility.
 
 
 16
 With respect to a reduction for a minor participant in the offense, U.S.S.G. § 3B1.2, Alberty has the burden of proving his role by the preponderance of the evidence. United States v. Gordon, 895 F.2d 932, (4th Cir.), cert. denied, 111 S. Ct. 131 (1990). "Downward role in the offense adjustments are aimed at a defendant'who plays a part in committing the offense that makes him substantially less culpable than the average participant.' " United States v. Palinkas, 938 F.2d 456, 460 (4th Cir. 1991), quoting U.S.S.G. § 3B1.2, comment. The reduction is intended for defendants who clearly played the lesser role among those involved. Id. We review the district court's finding for clear error. United States v. Sharp, 927 F.2d 170, 175 (4th Cir. 1991).
 
 
 17
 At trial, Watts testified that Alberty purchased five to six ounces of cocaine per week for approximately a year. Based on this testimony, it is clear that Alberty was involved in the conspiracy for a significant portion of its duration and purchased and sold cocaine on a regular basis during the conspiracy. In light of this evidence, we cannot say that the district court was clearly erroneous in finding that Alberty was not a minor participant.
 
 IV
 
 18
 Hardy[3] argues that the voluntary statement he gave to officer Wilhoit during the search of his house was improperly admitted into evidence. Hardy contends that the evidence was of other crimes, wrongs, or acts which is excluded under Fed. R. Evid. 404(b) when used to prove the character of a person. Alternatively, Hardy argues that the evidence was not relevant under Rule 402 and, if relevant, its relevance was outweighed by its prejudicial effect under Rule 403.
 
 
 19
 In fact, the statement was not Rule 404(b) evidence at all. The statement was instead an admission by Hardy that he knew Mo, i.e., Williams, and that he had knowledge of Williams' activities. Such statements against interests are clearly admissible under Fed. R. Evid. 801(d)(2)(A). This statement, implying knowledge of Williams' involvement in a drug conspiracy, was clearly relevant, along with other evidence, for purposes of linking Hardy to the conspiracy. Hardy fails to suggest how the admission of this evidence could have provided an improper basis for a decision. "Unfair prejudice" does not include within its purview the damage done to a defendant's case which arises from the "legitimate probative force of the evidence." Charles A. Wright, Kenneth W. Graham Federal Practice and Procedure, § 5215 (1978).
 
 V
 
 20
 For the reasons stated herein, the convictions and sentences of Hardy and Alberty are hereby affirmed.[4]
 
 AFFIRMED
 
 
 [1]
 Four other defendants were also indicted; however, this appeal involves only Hardy and Alberty
 
 
 [2]
 A reduction for acceptance of responsibility may be allowed in certain limited circumstances if a defendant merely contests matters that do not relate to factual guilt
 
 
 [3]
 Without objection, Hardy's appeal was submitted on briefs without oral argument
 
 
 [4]
 The appellant's motion to submit a supplemental appendix containing the pre-trial photographic spread was granted and we have considered this material in reaching our decision