7 F.3d 228
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tony RISELLI, a/k/a Herman Hernandez, Defendant-Appellant.
United States of America, Plaintiff-Appellee,
v.
Edward Charles Hernandez, Defendant-Appellant.
 Nos. 92-5676, 92-5677.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 11, 1993.
Decided: September 21, 1993.
 
 Appeals from the United States District Court for the Southern District of West Virginia, at Charleston.
 Lee F. Benford, II, for Appellant Hernandez
 Jane Charnock, CHARNOCK & CHARNOCK, for Appellant Riselli.
 Kelly D. Ambrose, Assistant United States Attorney, for Appellee.
 Michael W. Carey, United States Attorney, for Appellee.
 S.D.W.Va.
 AFFIRMED.
 Before RUSSELL and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 PER CURIAM:
 
 OPINION
 
 1
 Tony Riselli and Edward Hernandez appeal their convictions relating to a bank fraud scheme and the related sentences imposed, raising a variety of claims. Finding no reversible error, we affirm.
 
 
 2
 * In June 1991, appellant Riselli, general manager of a proposed airline, Southeast Airlines (SEA), met with a marketer named Michael Predmest to discuss ticket sales for his new airline. The two men ultimately negotiated a contract whereby one of Predmest's companies, American Marketing Group, Inc. (AMG), would provide marketing services for SEA. Pursuant to that agreement, they set up a joint escrow account ("the Brica account") to hold revenue generated by AMG's sale of SEA tickets before SEA actually obtained Federal Aviation Administration (FAA) approval to fly. Checks drawn on the account were to require the signatures of both men.
 
 
 3
 While negotiating the marketing agreement, Riselli had told Predmest that the FAA was about to approve SEA. That wasn't the case; in fact, the FAA terminated SEA's certification process altogether in August 1991 due to the resignation of the airline's chief pilot and its failure to produce documentation of leased aircraft. Riselli didn't alert Predmest to this fact, however; instead, he kept telling Predmest the airline would be flying in the Fall.
 
 
 4
 On September 16, 1991, Riselli deposited a $22,000 check in the Brica account which he and Predmest earlier had reserved for deposits by AMG of the proceeds from advance sales of SEA tickets. The check, purportedly issued by the Colgasco Federal Credit Union, was drawn on the National Bank of Commerce in Charleston, West Virginia and made out to the Brica account. Explaining this improper deposit to Predmest, Riselli cited some amorphous"problems" with SEA's regular corporate account.
 
 
 5
 Seven days later, on September 23, Riselli began withdrawing funds from the Brica account based on the $22,000 he ostensibly had deposited there. He convinced Predmest to co-sign three checks that day: one for $2,200 made out to Brica, Inc. (another Predmest entity) for consulting services rendered, another for $5,000 payable to Riselli, and a third for $8,000 payable to cash but given to Riselli. On September 26, Riselli not only convinced Predmest to co-sign for him another $6,000 check drawn on the Brica account and payable to cash but also got Predmest to cash it for him. On October 1, 1991, Riselli secured Predmest's authorization for another $600 withdrawal payable to Riselli. These five withdrawals left the Brica account with an apparent balance of approximately $250.
 
 
 6
 Appearances were deceiving. Shortly after these withdrawals, Barnett Bank of South Florida, holder of the Brica account, froze all Predmest's business and personal accounts after learning that the Colgasco check Riselli had deposited was fraudulent. When Predmest contacted Riselli about the problem, Riselli told him not to worry, that if anything happened, he would "cover" Predmest.
 
 
 7
 Meanwhile, the day after Riselli had deposited the fraudulent Colgasco check in the Brica account, his brother Hernandez had gone to another Florida bank, the Bank of North America, and, using a false address, had opened a new account by depositing a second apparently genuine Colgasco check, this time for $27,500 payable to Hernandez. With the exception of payee and amount, this check was substantially identical to the fraudulent Colgasco check deposited by Riselli.[1] The bank had told Hernandez the check wouldn't clear for nine days, but a week later, on September 24, it had let him withdraw $1,000 from his new account anyway.
 
 
 8
 Later that same day, at yet another bank, Hernandez had cashed for his brother the $8,000 check Riselli had procured earlier from the Brica account.
 
 
 9
 Ultimately the second fraudulent Colgasco check was returned to Hernandez's new bank unpaid. The bank's manager called Hernandez's home, alerting Hernandez's wife to the problem, and also sent a variety of correspondence to the false address given by Hernandez. Initially Hernandez didn't return the calls, and the letters, sent to the wrong address, ultimately were returned undelivered, but Hernandez began repaying the $1,000 he had withdrawn on the check the following month.[2]
 
 
 10
 Based on these activities, a federal grand jury in the Southern District of West Virginia indicted Hernandez and Riselli for violations of 18 U.S.C. §§ 1344 and 2. Count One of the indictment charged Hernandez with fraud connected to his deposit of the $27,500 Colgasco check and subsequent withdrawal of $1,000. Counts Two, Four, and Five charged Riselli with fraud in connection with three of the checks drawn on the Brica account which were ostensibly funded by the fraudulent $22,000 Colgasco deposit. Count Three charged Riselli and Hernandez with aiding and abetting each other with respect to the other check drawn on that account, the $8,000 check Hernandez cashed for his brother.
 
 
 11
 Appellants lost a pretrial motion to dismiss for lack of venue, and the case was tried to a jury. The jury returned guilty verdicts against each defendant on all applicable counts, whereupon the district court sentenced Hernandez to 13 months imprisonment with restitution of $300 and Riselli to 21 months imprisonment and $22,000 restitution.
 
 
 12
 Riselli and Hernandez appealed.
 
 II
 
 13
 Both Riselli and Hernandez challenge (1) the propriety of the venue selected by the government; (2) the exclusion at their trial of certain evidence as hearsay; (3) the sufficiency of the evidence used to convict them; (4) the propriety of the district court's responses to queries from the jury; and (5) the district court's refusal to award them a reduction in sentencing level for acceptance of responsibility. Hernandez presents two additional objections to the district court's sentencing findings concerning him, contending that it erred in assessing the amount of intended loss for which he was responsible and that it improperly denied him a reduction for playing a minor or minimal role in the offense. We address all these contentions.
 
 
 14
 * We consider first the appellants' claim that venue was improper. Venue lies "in a district in which the offense was committed." Fed. R. Crim. P. 18. If Congress fails to specify the situs of the offense, the nature of the crime and location of its constitutive acts determine it. United States v. Kibler, 667 F.2d 452, 454 (4th Cir.), cert. denied, 456 U.S. 961 (1982). The government must establish venue by a preponderance of the evidence, see United States v. Blecker, 657 F.2d 629, 632 (4th Cir. 1981), cert. denied, 454 U.S. 1150 (1982), and we review the district court's evaluation of venue's propriety de novo.
 
 
 15
 Riselli and Hernandez both were charged with violating 18 U.S.C. § 1344 by "knowingly ... attempt[ing] to execute a scheme and artifice to defraud financial institutions," including the National Bank of Commerce in the Southern District of West Virginia. Therefore, had appellants' criminal attempt succeeded, its effects would have been felt there. All the concrete acts associated with the attempt, however, took place in Florida; that's the rub. Thus appellants' contention that venue doesn't lie in the Southern District of West Virginia.
 
 
 16
 Certain problems obviously inhere in trying to locate for venue purposes where an "attempt[ ] to execute a scheme to defraud" a particular bank occurred since the acts constituting the crime aren't defined with sufficient precision that they meaningfully can be said to have any location. This circuit, however, has adopted a liberal approach to venue determinations awarding substantial consideration to the place where the results of the crime are felt and to the concerns of the threatened jurisdiction. In Kibler, for instance, we held that venue for intimidating a witness lies in the place where the witness was to testify, i.e. the place where the result of the crime would be felt, as well as the place where the intimidating acts occurred. 667 F.2d at 454. We think Kibler's logic dictates a similar finding that venue in this bank fraud action lies at the place where the results were or would have been felt, the Southern District of West Virginia, and therefore find no error in the district court's conclusion that venue was proper.
 
 B
 
 17
 At trial, appellants based their defense entirely on lack of the necessary specific intent to defraud. Both testified, and each claimed to have received his fraudulent Colgasco check from a man known to him as Toks. Both appellants, as well as a number of friendly witnesses, identified Toks as SEA's sole investor. Riselli claimed his $22,000 Colgasco check was an investment in SEA; Hernandez claimed his $27,500 check was payment for his wife's jewelry, which he'd sold to Toks because he was short on cash. To further their defense, Riselli and Hernandez had hoped to present evidence that representations made by Toks and deals he made at the SEA offices made him appear to be a legitimate international commodities broker and investor capable of writing legitimate checks for large sums of money.
 
 
 18
 Whether or not the representations allegedly made by Toks were, if made, true, and whether or not the transactions allegedly conducted by Toks, were, if conducted, genuine, evidence of their making and conducting would have tended to support the Riselli/Hernandez theory that they reasonably believed Toks was a big-spending investor capable of honoring genuine checks in large denominations. When Riselli and Hernandez tried to introduce that evidence, however, the district court excluded much of it as hearsay. Appellants now challenge these exclusions, contending (1) that the statements weren't hearsay because they weren't admitted to prove the truth of the matter asserted and (2) that even if they were hearsay the statements were admissible under Fed. R. Evid. 803(3)'s "state of mind" exception to the hearsay rule.
 
 
 19
 We needn't reach appellants' second contention, because Riselli and Hernandez correctly assert that the statements in question weren't hearsay. Toks' alleged representations and transactional conduct weren't offered to prove the truth of any matter asserted in them and therefore fall outside the definition of hearsay. See United States v. Samuel, 431 F.2d 610, 613 (4th Cir. 1970), cert. denied, 401 U.S. 946 (1971); United States v. Kohan, 806 F.2d 18, 22 (2d Cir. 1986).
 
 
 20
 Despite this obvious nonconstitutional error, however, we won't reverse if the government shows it is "highly probable that the error did not affect the judgment." United States v. Nyman, 649 F.2d 208, 212 (4th Cir. 1980) (quoting Roger Traynor, The Riddle of Harmless Error 34-35 (1976)); see United States v. Barnes, 747 F.2d 246, 25051 (4th Cir. 1984). The government seeks to do that here, contending that the Toks statements the district court refused to admit merely bolstered defenses by Riselli and Hernandez which were otherwise adequately presented to the jury.
 
 
 21
 Appellants presented considerable evidence in support of their theory that they believed the Colgasco checks to be genuine. Both testified that the Colgasco checks came from Toks, an SEA investor, and that they thought the checks legitimate when they deposited them. Appellants and their witnesses were prevented, however, from describing Toks based on his representations and also prevented from describing the contents of business correspondence Toks received at SEA's office that might have suggested he was a legitimate investor.
 
 
 22
 The entirety of this excluded testimony was vouched for ruling upon its admission. At the vouching, Hernandez testified that Riselli had told him Toks was financing SEA. He also testified that a fax received at the SEA offices during one of his visits had confirmed a large oil deal involving Toks, and that Riselli had told him of two other potentially lucrative deals involving Toks. Riselli testified that based on certain transactions he had witnessed at SEA's offices and on representations made by Toks himself, he had believed Toks was an international commodities broker.
 
 
 23
 Several other witnesses for Riselli and Hernandez also testified about Toks at the vouching. Anthony Maiuro, a participant in SEA's organizing effort, testified that Toks had mentioned to him some involvement with a Nigerian diamond mine. Albert Hutton, one of SEA's incorporators, testified that Toks once had suggested to him that he had a $21 million line of credit. In addition, Riselli had told Hutton that Toks was an international commodities broker. Carolyn Delvecchio, another participant in the SEA venture, testified that Toks had reassured her he had "plenty of money" to help along SEA.
 
 
 24
 None of these witnesses, however, was aware of any actual contribution of funds by Toks to SEA. And only Hernandez's and Riselli's beliefs about Toks's legitimacy are relevant. With respect to the appellants, the evidence actually adduced at trial and the evidence that would have been adduced on cross-examination had the vouched testimony been admitted make clear that the district court's failure to admit the evidence involved was harmless.
 
 
 25
 Riselli's version of events and alleged lack of knowledge are patently incredible. Despite months of promising millions, Toks never provided more than a few thousand dollars in cash and office equipment. In fact, that summer Riselli had given Toks $600 when he was short on cash. Yet Toks was Riselli's only investor; efforts to recruit others had been uniformly unsuccessful, and Riselli's earliest filings with the Federal Aviation Administration (FAA) represented that Toks's corporation, Vencap Holding, Inc., was the airline's financial backer. Vencap, however, didn't exist until a month after this filing, when Riselli, not Toks, started the ball rolling with the Delaware Secretary of State.
 
 
 26
 When he supposedly accepted the fraudulent $22,000 check from Toks, drawn on a credit union of which he knew nothing by a corporation, Colgasco, of which he had never heard, Riselli already knew Toks had written SEA another bad check for $735,000. At the time he received the $22,000 check, one of SEA's bank accounts was overdrawn by $7,700 as a result of an earlier fraudulent deposit by Riselli, a counterfeit check for $12,500 from a party other than Toks. Despite that overdraft, Riselli was still writing bad checks to SEA employees drawn on the bank account and telling the bank that a $2 million dollar deposit was on the way, a deposit that never arrived.
 
 
 27
 After depositing the $22,000 check in the Brica escrow account, Riselli immediately withdrew $13,000 from it in separate checks of $8,000 and $5,000. While he cashed the latter check himself, he had Hernandez cash the former at a different bank. During the time he was busy taking this money from the Brica account, it never occurred to Riselli to notify Predmest that SEA's application for certification had been canceled by the FAA.
 
 
 28
 Because Riselli so obviously lacks credibility, we conclude that any error in refusing to admit testimony based on alleged representations made by Toks or deals allegedly conducted by him was harmless error.
 
 
 29
 We also hold the district court's improper exclusion of testimony about Toks's statements was harmless with respect to Hernandez. While Hernandez claims that his knowledge of Toks led him to believe Toks had the wherewithal to purchase his wife's diamonds for $27,500, Hernandez's conduct more readily suggests that he obtained a fraudulent check from his brother or from Toks that he hoped would deceive the bank where he deposited it because he was short on cash. The fraudulent $27,500 check was used by Hernandez to open a new bank account with a false address the day after his brother deposited the fraudulent $22,000 check. That same day Hernandez cashed for his brother the $8,000 check drawn on the Brica account and ostensibly backed by the fraudulent $22,000 Colgasco check. Although that bank told him his own $27,500 check wouldn't clear for nine days, Hernandez returned early and convinced the bank to permit him to withdraw $1,000. The scheme didn't work, and Hernandez repaid the bank in part, but that doesn't cast doubt on his knowledge of the check's fraudulent character.
 
 C
 
 30
 Riselli and Hernandez also challenge the sufficiency of the evidence used to convict them. We review such claims solely to determine there was "substantial evidence, taking the view most favorable to the government, to support [a] finding of guilt." United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989).
 
 
 31
 In essence, appellants argue that the government failed to prove they knew the Colgasco checks they deposited were fraudulent.[3] A careful review of the evidence summarized above, however, suggests otherwise. Riselli and Hernandez took the stand in this case, and they presented a dubious version of the events in question considerably at odds with the other evidence adduced. Their cross-examination by the government revealed numerous inconsistent statements and a number of outright lies told to various parties in the course of financial transactions related to SEA and the fraud charged in this case. As the government points out, if the jury concluded that Riselli and Hernandez made false statements in the course of the conduct at issue or gave false testimony at trial, it was entitled to infer that avoiding criminal sanction motivated the fabrication. See United States v. Castro, 476 F.2d 750, 753 (9th Cir. 1973). Considering the totality of evidence presented to the jury, we conclude it was entirely reasonable for the jury to find beyond a reasonable doubt that Riselli and Hernandez lied to avoid sanction for a fraud they sought to work with the fraudulent Colgasco checks. Accordingly, we conclude that the evidence was sufficient to sustain the appellants' convictions.
 
 D
 
 32
 The jury sent the district court two notes after retiring. One asked to have the portion of the charge concerning the determination of "innocence or guilt and burden of proof" reread, and the other asked, "Is it possible under Count 3 to find one defendant guilty and the other innocent?" The record doesn't reflect the district court's response to the first note. The government says the district court "obviously" reread the charge; the defendant assumes it didn't. On the second note, the district court scribbled a written reply,"Yes it is, so long as you find the other defendant committed the crime by himself, or that the help he received from the innocent defendant was given by the innocent defendant innocently."
 
 
 33
 Riselli and Hernandez argue that the district court confused the jury to their prejudice by using the jury's word "innocent" in the sole record response to the jury's queries. In appellants' rather speculative formulation, the jury's evident uncertainty about the concepts of guilt, "innocence," and the burden of proof could only have been magnified by the district court's failure to reread the charge on that topic and its provision of the second answer in terms of "innocence" rather than "lack of guilt."
 
 
 34
 We review the district court's handling of a jury's requests for supplemental instructions deferentially, for abuse of discretion. United States v. Horton, 921 F.2d 540, 546 (4th Cir. 1990), cert. denied, 498 U.S. 846 (1991). Given that the jury's second query had nothing to do with the government's burden of proof at trial or the distinction between "innocent" and "not guilty," we find no abuse of discretion in the district court's decision to respond concisely and in kind to the jury's thoughtful but terminologically flawed question.
 
 E
 
 35
 Finally, we address appellants' sentencing challenges. Both Riselli and Hernandez argue that the district court erred in denying them appropriate credit for acceptance of responsibility. This claim lacks merit. Although both men admitted committing the criminal acts behind the crimes charged, both also continued to deny that they had the mental state (knowledge that the Colgasco checks were fraudulent) necessary for conviction. Accordingly, we find no clear error in the district court's perfectly logical conclusion that a reduction in offense level for acceptance of responsibility was inappropriate. See United States v. Gordon, 895 F.2d 932, 936 (4th Cir.), cert. denied, 111 S. Ct. 131 (1990) (affirming the denial of an adjustment for acceptance of responsibility where defendant admitted drug possession but denied intent to distribute, proof of which was also necessary to secure his conviction).
 
 
 36
 Hernandez presents two additional challenges. First, he argues that the district court erred in sentencing him based on a loss due to fraud exceeding $40,000, since he actually withdrew only $1,000 and thereafter made restitution of $700 before indictment. This claim also lacks merit. Hernandez deposited a fraudulent check for $27,500 and cashed an $8,000 check on the account where his brother had deposited a fraudulent $22,000 check. Intended loss, not actual loss, is the proper basis for this calculation, see U.S.S.G. § 2F1.1, comment (n.7), and we conclude that the district court committed no clear error in determining that Hernandez more likely than not was a knowledgeable participant in a scheme intended to cause a loss to the banks of $49,500.
 
 
 37
 In his second challenge, Hernandez contends for a minimal or minor role reduction. Such a reduction would be appropriate only if Hernandez were "substantially less culpable" than his brother. See United States v. Palinkas, 938 F.2d 456, 460 (4th Cir. 1991), vacated, 112 S. Ct. 1464 (1992), reinstated, United States v. Kocheckian, 977 F.2d 905 (4th Cir. 1992). The evidence recited above shows, without further analysis, that this wasn't the case. Accordingly, we conclude that the district court committed no clear error in denying the reduction.
 
 III
 
 38
 For the reasons expressed above, the convictions and sentences imposed on Riselli and Hernandez are all AFFIRMED.
 
 
 
 [1]
 They were also one sequence number apart
 
 
 [2]
 By the time of trial, he had repaid $700
 
 
 [3]
 Appellants' contention that the lack of actual loss to the National Bank of Commerce in the Southern District of West Virginia precludes their conviction on Count One lacks merit because the indictment charged an attempt to commit bank fraud and not simply the completed offense. This fact alone sufficiently distinguishes the case before us from United States v. Orr, 932 F.2d 330 (4th Cir. 1991), on which Riselli and Hernandez rely