UNITED STATES of America, Plaintiff–Appellee,

v.

Christopher GARY, Defendant–Appellant.

No. 92–5652.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 28, 1993.

Decided Feb. 28, 1994.

**ARGUED:** George Alan DuBois, Jr., Assistant Federal Public Defender, Raleigh, North Carolina, for appellant. John Samuel Bowler, Assistant United States Attorney, Raleigh, North Carolina, for appellee.

ON BRIEF: Margaret Person Currin, United States Attorney, Raleigh, North Carolina, for appellee.

Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

ERVIN, Chief Judge:

Christopher Gary was convicted on June 3, 1992 of twelve counts of mailing threatening communications in violation of 18 U.S.C. § 876. The revised presentence report calculated the Federal Sentencing Guidelines range to be 30 to 37 months. At the sentencing hearing on September 24, 1992, the district court adjusted the base offense level upward by six levels for conduct evidencing an intent to carry out the threats and upward by two levels for selection of a vulnerable victim, finding the range to be 70 to 87 months. The district court then departed upward by twelve levels from the Guideline range on grounds of extreme psychological injury to the victim and extreme conduct by the defendant. The district court imposed a sentence of 250 months incarceration followed by a term of 36 months supervised release and imposed $600 in special assessments. Gary appeals only his sentence.

We affirm the adjustment for conduct evidencing an intent to carry out the threats. We find, however, that enhancing the sentence both for selection of a vulnerable victim and for extreme psychological injury amounted to double counting the same criminal conduct and that the district court erred in applying both enhancements. The vulnerable victim adjustment is not appropriate in these circumstances. We further hold that, although the district court correctly found a departure warranted for extreme psychological injury and extreme conduct, the district court erred in its application of the departure because the court failed to demonstrate any analytical basis supporting the extent of the departure. We do not imply that the district court must reduce the upward departure imposed on remand, but simply that a reasoned basis for the court's decision must be set forth. We therefore vacate the sentence imposed by the district court and remand the case for resentencing.

## I.

Christopher Gary met Jean Grim in 1987 when he was hired as a repairman by her employer, Carolina Custom Golf, in Raleigh, North Carolina. While Gary worked with Grim, their relationship was cordial but did not go beyond professional. Gary left Raleigh in May 1988 to return to his home in Chattanooga, Tennessee. Gary was incarcerated in Tennessee on a DUI conviction from July 1988 until the summer of 1989. During this period, he began calling the golf shop at its toll-free number to talk to all its employees. He began having friendly conversations with Grim at this point. The relationship became more friendly as Gary asked Grim for advice and support related to his alcoholism. The long distance relationship continued following his release from prison, with the pair sending cards and letters and occasionally phoning each other until mid-1990.

In June 1990, Gary returned to Raleigh to look for work. Gary and Grim had four or five dates over a five week period and slept together twice. By the end of July, however, Grim began pulling away from Gary. When her sister was undergoing serious surgery, Grim asked Gary not to call her for awhile. Gary became angry and began calling Grim five to seven times a day at work, despite repeated pleas not to disturb her workplace. He also began writing her angry letters.

Unable to find work in Raleigh, Gary returned to Chattanooga in early August, 1990. The phone calls and letters to Grim increased in frequency. He would call repeatedly until four in the morning and sent up to eight letters a day, each six to eight double-sided pages long. The communications became increasingly angry and threatening. They caused Grim tremendous stress and she was often unable to sleep. Grim changed her home phone number to no avail; the calls continued. Despite office-wide meetings convened by Grim to prevent his calls from reaching her, Gary's calls still got through. The situation at the golf shop became intolerable; the calls were causing tension through-

out the workplace. Grim was forced to resign in October, 1990 after six years of employment.

After her resignation, Grim changed her home phone number a second time and the calls stopped. The letters, however, continued and became more violent. Gary threatened to return to Raleigh at Christmas and harm her and visiting family members. Because she was terrified for the safety of her family, Grim called Gary and made a deal with him. She agreed to meet with him to allow him to speak his mind if he would wait until after Christmas to return. After these plans were made, the letters continued but were not as violent.

On February 14, 1991, Gary went to Grim's apartment and left a note on her windshield informing her that he had returned and was in the hotel up the street. He told her to call him to arrange a meeting. Because Grim believed he would leave her alone if she would meet him and allow him to say what he wanted, she called to arrange a meeting. They met in front of Grim's condominium with her roommate, Amanda Webster, watching from the kitchen window with phone in hand to call for help if necessary. Gary arrived intoxicated half an hour late. He gave Grim a card and professed his love to her for about twenty minutes. Grim did not reciprocate. Grim finally went back inside and Gary left quietly.

Less than a week later, Gary left flowers and a card on Grim's windshield. Grim defaced the card and crushed the flowers, leaving both outside her door. She put a note on her door telling Gary that if he didn't leave her alone, she would call the authorities. Several days later, on February 21, 1991, Gary went to Grim's home and pounded loudly on the door, yelling obscenities. He was apparently seeking an explanation for the note on the door. When his behavior became more violent and she feared he was trying to enter to carry out his threats, she called the police. When the police arrived, Gary left. Because Grim feared for her life, she applied for a gun permit in March, 1991 and purchased a handgun. Gary's letters continued and made repeated graphic threats to harm Grim, her family, and her roommate.

On June 13, 1991, Gary pled guilty in Wake County District Court to communicating threats to Grim and was sentenced to six months in jail. He served thirty days and was released on July 15, 1991. This conviction was based on the letters Gary sent to Grim from October 30, 1990 until December 25, 1990. On the day he was released, Gary went to Grim's home, vandalized her home and car and left a note on her windshield stating, "Guess who got out today, bitch?" Gary immediately returned to Chattanooga and resumed letter-writing seven days later. The series of letters serving as the basis of this conviction was written between July 22 and September 15, 1991.

Gary began a six-week alcohol and cocaine binge during which he wrote eighteen letters to Grim totaling eighty-eight pages. The gruesome details of these letters are summarized in Appellee's brief and the letters themselves constitute a large part of the joint appendix.

Suffice it to say here that the letters were often written in the defendant's own blood and detailed the gory specifics of innumerable tortures Gary planned to inflict on Grim and her roommate.

Following Grim's repeated appeals to local authorities, Raleigh Police Officer Marshall Carroll called Gary in Tennessee on August 26, 1991, to tell him to stop sending the letters. The letters continued, however, with Gary belittling Carroll's attempts to help Grim. The final letter in this series was written on September 5, 1991. On September 19, 1991, Gary was arrested in Chattanooga, Tennessee and sentenced to six months incarceration for possession of marijuana and public intoxication. On December 2, 1991, Gary was arrested on the instant charges. The grand jury returned an eighteen count indictment on December 19, 1991. After a psychiatric evaluation determined that Gary was fit to stand trial, trial began on June 1, 1992. He was convicted on June 3, 1992. While incarcerated prior to sentencing, Gary wrote numerous hostile letters to the prosecutor and the trial judge. In these letters, Gary expressed his hatred for Grim and the prosecutor and reconfirmed his ob-

session with Grim: "What I have to do is break her of her conduct.... What I am really upset about is that when I read that she is thinking of moving out of state before I get released." These letters, written after conviction, evidence the unrelenting nature of Gary's conduct. He was sentenced to 250 months in prison on September 24, 1992 and this appeal followed.

## II.

The standard for review of application of the Sentencing Guidelines to the facts of a particular case is set forth in 18 U.S.C. § 3742(e):

> The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give *due deference* to the district court's application of the guidelines to the facts. (Emphasis added.)

This court has found that

> the amount of deference due a sentencing judge's application of the guidelines to the facts thus depends on the circumstances of the case. If the issue turns primarily on a factual determination, an appellate court should apply the 'clearly erroneous' standard. If the issue, for example, turns primarily on the legal interpretation of a guideline term, which of several offense conduct guidelines most appropriately apply to the facts as found, or the application of the grouping principles, the standard moves closer to de novo review.

*United States v. Daughtrey,* 874 F.2d 213, 217 (4th Cir.1989) (internal citations omitted).

The standard of appellate review for departures from the Sentencing Guidelines is the *reasonableness* standard set forth in 18 U.S.C. § 3742(e)(3).

> We review the validity of the district court's upward departure under a multi-part test of "reasonableness," as set forth in *United States v. Hummer,* 916 F.2d 186, 192 (4th Cir.1990), *cert. denied,* 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991). Under this test, we first make a de novo determination of whether the specific

reasons cited by the district court are adequately taken into consideration by the Guidelines. Second, we review the factual support in the record for the identified circumstances under a clearly erroneous standard. Third, we apply an abuse of discretion standard to determine if, on balance, the cited departure factors are of sufficient importance in the case that a sentence outside the Guidelines range "should result." Last, we utilize an abuse of discretion standard to resolve whether the extent of departure is reasonable.

*United States v. Palinkas,* 938 F.2d 456, 461 (4th Cir.1991).

## III.

Gary was convicted of mailing threatening communications in violation of 18 U.S.C. § 876 and was sentenced pursuant to U.S.S.G. § 2A6.1. The base offense level identified is 12, but § 2A6.1(b)(1) states that "if the defendant engaged in any conduct evidencing an intent to carry out such threat, increase by 6 levels."

■ Gary argues that because the letters forming the basis of his conviction were written between July 22 and September 5, 1991, none of his actions prior to that time may be considered in deciding whether to apply the adjustment, despite the unrelenting nature of his acts. His threatening phone calls and February, 1991 visits to Grim's apartment arguably cannot be considered because they occurred prior to the series of letters in question. The Second Circuit has agreed with this approach and held that conduct to warrant this specific offense characteristic must occur contemporaneously with or after the threat was made; such conduct cannot occur before the threat was communicated. *United States v. Hornick,* 942 F.2d 105, 108 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 942, 117 L.Ed.2d 112 (1992).

The Seventh Circuit, however, has found that the conduct referred to in the Guidelines need not involve actions undertaken contemporaneously with or otherwise as part of the threatening communication. *United States v. Fonner,* 920 F.2d 1330, 1332 (7th Cir.1990). As other courts have recognized, "the pivotal

inquiry is into the defendant's intent and the likelihood that the defendant would carry out the threat." *United States v. Harris,* 763 F.Supp. 546, 550 (M.D.Ala.1991) (internal citations omitted). We find this reasoning convincing. Any acts that evidence an intent to carry out the threats on which a conviction is predicated, whether committed prior to or following such threats, may form the basis of the § 2A6.1(b)(1) adjustment.

■ Gary's conduct evidencing an intent to carry out his threats is clear. His angry visit to Grim's apartment on February 21, 1991 is sufficient to establish such intent. See *United States v. Hill,* 943 F.2d 873, 875 (8th Cir.1991) (defendant's return to town sufficient to evidence intent to carry out threat to kidnap). Such intent is further established by Gary's July 15, 1991 visit to Grim's apartment upon his release from prison during which he vandalized her home and car in the course of leaving a threatening message. This visit occurred only one week prior to the first letter upon which the conviction is based.

Even without considering Gary's prior conduct, the district court found that Gary had engaged in conduct constituting "stalking" of Grim after July 22, 1991. Grim testified that some of Gary's letters contained specific information concerning her whereabouts that could only have been obtained by watching her movements. Furthermore, Gary himself testified that during the period he wrote the letters in question, he consumed large amounts of cocaine, often by injecting and smoking the drug to enhance its effect. Gary often wrote in his letters that his cocaine usage made it more likely that he would carry out his threats. The district court found that

> the evidence is compelling and also not refuted that he stalked her and had the intent and ability to carry out his threats and created a very serious fear of bodily harm on her part. And that is my finding of fact, and it is grounded on all of the evidence in the case and his statements and letters.

The court's finding of fact that Gary engaged in conduct evidencing the intent to carry out his threats is not clearly erroneous. There-fore, the increase of the base offense level by six is affirmed.

## IV.

■ The district court also applied a victim-related adjustment increasing Gary's base offense level by two for selecting a vulnerable victim. The Guidelines provide that

> if the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct, increase by 2 levels. U.S.S.G. § 3A1.1.

The district court found that Gary's campaign of terror had left Grim in such a weakened mental and emotional state that she was particularly susceptible to his continued threats.

Some circuits have held that when the defendant's conduct induced the vulnerability, the enhancement could be applied if the defendant further exploited that weakness. See *United States v. Astorri,* 923 F.2d 1052, 1055 (3d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 444, 116 L.Ed.2d 462 (defendant's promise to marry the victims' daughter had made them unusually susceptible to the defendant's fraudulent scheme).

Most courts agree, however, that the defendant must have initially chosen his victim because of her particular vulnerability. The enhancement relates to the conduct of the defendant and should not be associated with the severity of the victim's suffering. *United States v. Long,* 935 F.2d 1207, 1211–12 (11th Cir.1991). This court, too, has recognized that the vulnerable victim enhancement is meant to punish an extra measure of criminal depravity in the selection of the victim. *United States v. Wilson,* 913 F.2d 136, 138 (4th Cir.1990).

Gary chose to send his threats to Grim because of their prior relationship. When he began his threats in July 1990, nothing suggests that Grim was particularly vulnerable to Gary's acts. Arguably, by July 1991 when Gary mailed his second round of letters, which serve as the basis for this conviction,

Grim was indeed particularly vulnerable to his continued hostility. The evidence of her deteriorated condition, however, more appropriately relates to her psychological injury. Her weakened state is appropriate evidence for the application of a departure for extreme psychological injury; using it as evidence of Gary's selection of a vulnerable victim amounts to double counting. The district court erred by applying this victim-related adjustment to increase the base offense level by two.

## V.

The district court, after determining the applicable Guideline range by making all relevant adjustments, departed upward from that range on the basis of two Commission-identified grounds. The court found that Gary's base offense level should be increased by 12 levels for extreme psychological injury and extreme conduct. A *Hummer* analysis of the district court's sentencing must be performed to determine whether the departure is reasonable.

## A.

The process of review for departures, as set forth in *Hummer* and *Palinkas* described in Section II above, first requires this court to make a de novo determination of whether the specific reasons cited by the district court are adequately taken into consideration by the Guidelines. In this instance, this is a simple determination. The Application Note to Guideline § 2A6.1 states:

> The Commission recognizes that this offense [threatening communications] includes a particularly wide range of conduct and that it is not possible to include all of the potentially relevant circumstances in the offense level. Factors not incorporated in the guideline may be considered by the court in determining whether a departure from the guidelines is warranted. *See* Chapter Five, Part K (Departures).

Chapter Five lists both extreme psychological injury and extreme conduct as possible grounds for departure. The Guidelines thus specifically state that these grounds were not taken into consideration in determining the base offense level for threatening communications and may be considered for departures.

## B.

This court should next review the factual support in the record under a clearly erroneous standard. Based on the testimony of a probation officer as related in the presentence report, the testimony of the victim and her roommate at trial, the testimony of an FBI agent at the sentencing hearing and based on the judge's observations of the victim at trial, the district court had sufficient evidence to find that the victim suffered extreme psychological injury. The evidence indicated that Grim was so fearful that she obtained a gun; she was afraid to leave her house; when she returned to her home she made certain she had a loaded gun with her and then searched all the rooms and closets in her home and slept with the gun beside her bed; she now checked under the hood and body of her car for fear Gary had rigged it with dynamite; she was worried for her parents and any man she might be seen with; and, because Gary drove a motorcycle, the sound of any motorcycle made her so terrified that she was sometimes unable to work for two hours afterwards. She testified that the defendant has ruined her life completely and that she will never be the same again.

A departure is warranted for extreme psychological injury

> if a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense.... The extent of the increase ordinarily should depend on the severity of the psychological injury and the extent to which the injury was intended or knowingly risked.

U.S.S.G. § 5K2.3. "If there is any place in sentencing guidelines analysis where a factfinder is to be given considerable deference, it is here where the district court is called upon to assess the psychological impact upon victims." *Astorri*, 923 F.2d at 1058. Admittedly, the offense of mailing threatening communications can take many forms. The district court did not clearly err in finding that this particularly vile form of the offense

caused psychological injury much more serious than that normally resulting from the offense. The facts supported a finding that there was extreme psychological injury in this case.

■ Furthermore, the evidence of Gary's detailed letters, often written in his own blood, describing the specific tortures he planned to inflict on his victim, placing her in fear of being raped, mutilated and maimed, was sufficient to support the court's factual finding of extreme conduct. When

> the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

U.S.S.G. § 5K2.8. In determining extreme conduct, not only completed conduct may be considered. Where the defendant's intended plan expressly involves extreme conduct, the departure is warranted. *United States v. Kikumura,* 918 F.2d 1084, 1118 n. 41 (3d Cir.1990).

The district court had sufficient evidence to find that the extended nature of Gary's campaign prolonged Grim's pain and humiliation. Repeated sexual and physical threats were cruel and degrading. Furthermore, Gary clearly intended his acts to have this harmful effect. He wrote:

> Does it make you mad that I only did 54 days over you, and that you went and quit your job, went through hell, gained enormous amounts of weight, (you must have weighed 260 or so on Valentine's Day) nearly lost your mind, had to get therapy, bought a gun, (but will never get to use it, not on me) lived in fear, and still I am on my way to get even? There is no doubt I fucked your life up good, but at least its what I set out to do, after you fucked mine up.

Gary obviously intended the effects of his conduct. The district court did not clearly err in finding factual support in the record for a departure based on extreme conduct.

### C.

■ Given the nature of Gary's conduct and Grim's psychological injury, the district court did not abuse its discretion in determining that the departure factors were of sufficient importance that a sentence outside the Guideline range should result. The district court met the third step in the *Hummer* test.

### D.

■ The final step in this court's review of the departure is whether the extent of the departure was an abuse of the district court's discretion. The district court added 12 levels to Gary's base offense for extreme conduct and extreme psychological injury. This departure added 13 years to the Guideline range of 70 to 87 months, tripling the prison term. The district court stated that "I think that an adequate departure should be twice the base offense level, which is 24 rather than 12, and then to that the court should add the adjustments...." There is precedent permitting departures of such magnitude, as a brief review of relevant case law indicates.

In *Kikumura,* a 5 level increase was approved for extreme conduct where the defendant was convicted of transporting explosives in interstate commerce. 918 F.2d at 1094. Because his conduct was more serious than evident from the face of the charged offenses, the appellate court held that a departure from a Guideline range of 27 to 33 months to impose a sentence of 262 months would not be unreasonable. *Id.* at 1089. Overall, the court added 21 levels to his base offense.

In *United States v. Roberson,* 872 F.2d 597, 600 (5th Cir.1989), *cert. denied,* 493 U.S. 861, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989), where the defendant was convicted of abuse of access card, the court added 11 levels to the base offense for the extreme conduct of burning a corpse in relation to the offense. The sentence went from a range of 30 to 37 months to a sentence of 120 months, tripling the time imposed.

In *United States v. Guerrero,* 863 F.2d 245, 250 (2d Cir.1988), the court departed

from the Guideline range of 6 to 12 months to impose a sentence of 63 months. Fourteen levels were added to the base offense because of the large amount of drugs involved in the conviction.

In *United States v. Roberts*, 915 F.2d 889, 892 (4th Cir.1990), *cert. denied*, 498 U.S. 1122, 111 S.Ct. 1079, 112 L.Ed.2d 1184 (1991), this court stated in dicta that adding 14 levels to the base offense of sending threatening communications, turning a Guideline range of 6 to 12 months into a 60 month sentence, was not impermissible but would require "substantial reasons."

In *United States v. Pergola*, 930 F.2d 216 (2d Cir.1991), a case very similar to this one, the court affirmed a 10 level increase for extreme psychological injury and extreme conduct. In that case, the defendant was convicted of 2 counts of mailing threatening letters to his ex-girlfriend, Worsley. He threatened to seriously injure Worsley, his threats supported by the fact that he had murdered his first wife after she complained about his harassment of her. The recommended Guideline range was between 15 and 21 months. The court departed to a sentence of 60 months, adding 10 levels for the same grounds cited for the departure in Gary's case.

■ It bears noting that the statutory maximum in Gary's case would be 60 years, 5 years for each of the 12 counts on which he was convicted. Although the Sentencing Guidelines replace statutory sentencing, the statutory maximum may be informative in determining departures. *Kikumura*, 918 F.2d at 1094 n. 9; *Pergola*, 930 F.2d at 218–19; *United States v. Perkins*, 929 F.2d 436, 437 (8th Cir.1991); *Roberson*, 872 F.2d at 606; *United States v. Juarez–Ortega*, 866 F.2d 747, 748 (5th Cir.1989); *United States v. Correa–Vargas*, 860 F.2d 35 (2d Cir.1988).

Courts have clearly upheld departures similar to that imposed in Gary's case. Courts must, however, employ principled methods in making these determinations. It appears that the district court simply decided to double Gary's base offense level for the sake of doubling it. While the extent of the departure may be permissible, it is not permissible without any analytical reasoning behind the decision.

Some courts have found that "analogy to the guidelines is ... a useful and appropriate tool for determining what offense level a defendant's conduct most closely approximates." *Kikumura*, 918 F.2d at 1112. Analogies to similar offenses or aggravating circumstances may prove the best method for a principled determination of departures. A judge may be well advised to depart from the Guideline range upon "justifying the departure in terms of policy choices made in the guidelines." *United States v. Newman*, 965 F.2d 206, 213 (7th Cir.1992).

As noted in *Kikumura*,

"there may be vehicles for making offense-related departures under Ch. 5, Pt. K of the guidelines (and for determining the reasonableness thereof) other than the kind of analogic reasoning outlined above.... We do not rule out the development of other such vehicles."

918 F.2d at 1113. For example, the district court may find it helpful to analogize to similar case law, in which event the review of precedent above may prove instructive. We merely hold that the court must set forth some form of principled justification for its departure determination.

## VI.

The district court erred both in applying the offense level adjustment for selection of a vulnerable victim and in failing to articulate a principled basis for its departure. Gary's sentence is therefore vacated and the case is remanded for resentencing in accordance with this opinion.

*VACATED AND REMANDED.*