**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-4331**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH BOURABAH,

Defendant - Appellant.

**No. 24-4577**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOSEPH BOURABAH,

Defendant - Appellant.

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk. John A. Gibney, Jr., Senior District Judge. (2:23-cr-00037-JAG-RJK-1)

Submitted: March 11, 2026                    Decided: April 29, 2026

Before KING, WYNN, and RUSHING, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Wynn wrote the opinion, in which Judge King and Judge Rushing joined.

_____

**ON BRIEF:** Patricia A. Rene, RENE LAW FIRM, Williamsburg, Virginia, for Appellant. Erik S. Siebert, United States Attorney, Alexandria, Virginia, Matthew J. Heck, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

2

WYNN, Circuit Judge:

Criminal defendants enjoy a Sixth Amendment right to counsel. In some circumstances, they even enjoy a right to substitute that counsel if the relationship with counsel deteriorates beyond repair. But that substitution right has its limits—for reasons exemplified by this case.

Here, a criminal defendant asked the court to dismiss his court-appointed counsel early in his case. The court obliged but warned him it was unlikely to do so again. Still, just a week before trial, the defendant returned to the court and asked the court to dismiss his second lawyer. This time, the court said no. The defendant then pleaded guilty to the crime. Months later, however, he had second thoughts and moved to withdraw his plea. The district court denied that motion, too, and ultimately sentenced him to 100 months' imprisonment for a particularly cruel campaign of harassment directed at his victims.

The defendant now appeals several of the district court's decisions. But because we find no abuse of discretion in the district court's denial of the motion to substitute counsel, in its refusal to allow the defendant to withdraw his guilty plea, or in the reasonableness of the sentence itself, we affirm.

I.

A.

From approximately September 2021 to February 2023, Joseph Bourabah engaged in a targeted harassment campaign against his former friend, WR,[1] as well as members of

---

[1] We use initials here, as did the trial court, to preserve the anonymity of the victims.

her extended family, including her mother, AM; her fiancé, SE2; SE2's mother, SE1; and SE2's father, ME.[2]

The harassment began in September 2021, shortly after WR announced her engagement to SE2. Bourabah began by reposting, on SE1's Facebook page, pornography of WR that WR had created for adult websites. He then shared similar sexually explicit images and videos of WR to WR's family members and friends. Through a fake Facebook profile he created under the name "Emily Thomas," Bourabah also implied that WR was having an affair with the fictitious character's spouse. J.A. 519.[3]

Bourabah also targeted WR's extended family.

To harass AM, WR's mother, Bourabah sent her WR's pornography. He also posted on Craigslist that AM's ducks were available for free, resulting in a stranger taking all but one of her pet ducks. AM's trampoline was stolen out of her backyard after a similar posting. Eventually, AM had to put signs in her yard stating that there were no free Craigslist items at her home.

To harass SE2, WR's fiancé, Bourabah advertised SE2's car as being free for pickup at SE2's home. He attempted to have SE2's car towed. He advertised a "Pedo Kink Party" using SE2's photo and SE1's address. J.A. 1850. He created Facebook accounts in SE2's

---

[2] Ultimately, Bourabah pleaded guilty through an *Alford* plea, which allowed him to enter a guilty plea without admitting the underlying facts. *See North Carolina v. Alford*, 400 U.S. 25, 27 (1970). However, because the parties brief this case based upon the facts the government would have put on at trial, we recite the facts in that light, as well. *But cf. United States v. Alston*, 611 F.3d 219, 227 (4th Cir. 2010) (holding an *Alford* plea could not be used as factual basis for ACCA predicate convictions).

[3] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

name and posted inappropriate comments on his behalf. He created a Change.org petition demanding that the FBI take action against SE2. He sent SE2 emails asking SE2 when he would break and telling him that the harassment could last another ten years. He emailed SE2's former employer, posing as SE2, and writing that "[t]he pay is terrible, the people are rude, [and] I have witnessed constant sexual harassment." J.A. 1098. And he sent unsolicited food deliveries and other forms of harassment to that former employer at her place of business and her home, prompting her to remove her mailbox from the street.

To harass SE1, WR's fiancé's mother, Bourabah used Craigslist to advertise SE1's address as providing a free television, a Halloween costume party, an open house, and a New Year's Eve party. He ordered unsolicited tree cutting, carpet cleaning, junk removal, roof repair, and plumbing services at SE1's home. He tried to have SE1's car towed at least five different times. In each instance, service workers arrived at the home, only to be turned away by SE1. In all, SE1 documented over 700 incidents of harassment, building to a zenith of twenty to twenty-five people per day coming to her home during the worst of Bourabah's campaign.

To harass ME, WR's fiancé's father, Bourabah sent people to the residence that ME shared with his wife and their young son. He sent ME WR's pornography. He advertised the liquidation of ME's brewery on Craigslist, including the giving away of a commercial-sized oven. He targeted ME's rental properties with similar harassment.

For his family's protection, ME erected a barricade at his home, put up signs, purchased security cameras, and enrolled in credit protection. At one point, for "some sanity," ME took his family to Florida for nearly a month to escape the worst of the

harassment. J.A. 769–70. Still, ME, his wife, and their son were diagnosed with anxiety, depression, and PTSD. Their son also expressed suicidal ideations at school.

B.

After working with a confidential informant who had communicated with Bourabah on Facebook, the FBI obtained search warrants for Bourabah's Facebook communications. In those communications, Bourabah bragged about sending ten to fifteen people to the victims' homes every day. He sent another user a Craigslist advertisement for free backrubs at the victims' home; that advertisement noted that a "happy ending costs extra" and included photoshopped faces of SE1 and ME. J.A. 95.

The FBI also executed a search warrant on Bourabah's home. During that search, the FBI seized Bourabah's cell phone, which the FBI tied to Bourabah's real Facebook account and several other fake Facebook accounts used to harass the victims. In its notes section, the phone contained a list of ways that Bourabah had targeted SE2. Across several TextNow conversations recovered from the phone, Bourabah pretended to be ME and SE2, used the address for ME and SE2/SE1, requested people honk their horns when they arrived for certain services, and used the name of SE2's former employer. The phone also contained evidence of internet searches for SE2's former employer; for WR's pornography; and for the addresses of WR, SE1, and AM, as well as bookmarked tabs for towing services. And it contained photos of SE2's vehicle and of SE2, WR, and the image used in the fake "Emily Thomas" Facebook profile.

Other search warrants also linked email addresses associated with Bourabah with several of the Craigslist advertisements in question.

6

C.

Bourabah was arrested in March 2023 and assigned a Federal Public Defender at his initial appearance. A grand jury returned an indictment against Bourabah in April 2023 on five counts of cyberstalking in violation of 18 U.S.C. § 2261A(2)(B). Shortly thereafter, the district court set the trial for August 28, 2023.

On May 2, 2023, Bourabah was arraigned on the indictment. Six days later, his attorney filed a motion to withdraw as counsel, citing a "total impasse" with Bourabah, a "complete breakdown in communication," and an "irreparably damaged" relationship that had "made it impossible for counsel to continue representing" him. J.A. 60–61.

On May 15, 2023, the magistrate judge held a hearing on the motion to withdraw. In a colloquy with Bourabah, the magistrate judge questioned whether there was truly a breakdown in communication or whether Bourabah simply did not like the advice he was getting from his attorney. The magistrate judge told Bourabah,

> [I]f it's truly a breakdown, and you don't feel like he's being responsive to things you're asking him to do, then that is a basis to relieve him as your counsel. However, if the Court relieves [your counsel] and appoints another attorney, and that other attorney comes in and tells you the same thing, . . . there is going to be a real concern that this is not really a communication problem but an issue of you not being prepared to understand your attorney's guidance regarding the matters that you face here.

J.A. 73. Bourabah assured the magistrate judge that his problem had "nothing to do with . . . any of [the attorney's] decision-making" but that their relationship was "far beyond repair" because of a "severe communication breakdown." J.A. 74. The court granted the motion but warned that it was extremely unlikely to grant similar relief again.

The court appointed Criminal Justice Act panel attorney Anthony Gantous as Bourabah's new counsel. As trial approached, Gantous met with Bourabah many times to prepare a defense. Nevertheless, on August 22, 2023—six days before trial was set to begin—Gantous filed a motion to withdraw as counsel, citing an "irreparably damaged" relationship with Bourabah. J.A. 319.

In a hearing on the matter, Gantous represented to the magistrate judge that it had "become apparent, as trial approached, that we had completely different views and understandings of the defenses in the case that were available." J.A. 335. But he also noted that he had met with Bourabah roughly twelve different times and that the two had been "very frank and open with one another." J.A. 337. For his part, Bourabah told the magistrate judge that the breakdown was "[b]ecause Mr. Gantous has attempted to coerce me into taking a plea deal against my will. He has threatened me that the judge would punish me if I were to not take the plea deal against my will." J.A. 344.

Citing the untimeliness of the withdrawal request less than a week before trial and the court's prior warning that it would be unlikely to grant a similar request again, the magistrate judge denied the motion to withdraw. However, Gantous filed a motion to reconsider, and this time the government joined in the motion. The parties noted that privilege issues had prevented the magistrate judge from inquiring deeply into the communications between Gantous and Bourabah. Therefore, the parties asked the court to conduct an *ex parte* hearing with Gantous and Bourabah outside the presence of the government.

8

The district judge took over the matter and held a hearing on the motion. For part of the hearing, the court took the parties up on their suggestion and conducted an *ex parte* colloquy with Gantous and Bourabah, which was outside the presence of the government but on the record.[4] There, Bourabah stated that he was dissatisfied with Gantous's representation because, among other things, Gantous told him that he would not hire an expert witness to challenge the technical evidence in the case, that he would not cross-examine an FBI witness, that he would not put on a defense at trial, and that he was coercing Bourabah into taking a plea deal.

Gantous defended his representation. He clarified that he told Bourabah only that "there is very little defense to put on in this case" and that "[t]here is absolutely no need for an expert in this case." J.A. 414–15. He also informed the court that he had successfully negotiated a plea deal to limit Bourabah's prison time to five years and urged him to take it because Bourabah was otherwise "likely [to] be convicted on all five counts and be looking at a potential of 25 years." J.A. 416.

After engaging in this colloquy, the court found that the problem was not a lack of communication because "[t]here ha[d] been a great deal of communication between" Bourabah and Gantous "in terms of meetings and in terms of documents." J.A. 421. Rather, the court told Bourabah, the problem was that "[y]ou communicate to Mr. Gantous that you want things done, and Mr. Gantous communicates to you that he doesn't think those

---

[4] While the colloquy was undertaken *ex parte* at the time, the transcript of it is contained in the unsealed record in this appeal.

9

are helpful to you, and you don't agree with him." J.A. 421. That was not enough to warrant a second withdrawal of representation, so the district court denied the motion to reconsider.

So the parties proceeded to trial in August 2023.

On the first morning of trial, the court conducted voir dire and impaneled the jury. But over the lunch break, Bourabah decided to enter an *Alford* plea. After hearing the evidence that the government would have put on at trial, the court accepted Bourabah's plea.

Following the plea hearing, Bourabah sent letters to the court asking for various forms of relief but also including incriminating statements. For example, he wrote in March 2024 that "I know now that I was very wrong in my vigilante quest" and that "at the end of the day, I know that I did in fact get way carried away. I let my anger, fear, mental instability, and emotions get the best of me. And I couldn't be more sorry for it." J.A. 580–81.

In letters dated April and May 2024, however, Bourabah shifted course, alleging he had entered his *Alford* plea only because of ineffective assistance of counsel and requesting to withdraw that plea. He also asked, yet again, to withdraw Gantous's representation of him.

The court considered those requests at Bourabah's sentencing hearing in June 2024. It again denied Bourabah's motion to withdraw his counsel, largely for the same reasons as before.

Regarding the *Alford* plea, Bourabah told the judge that he did not do many of the things the government claimed he did and that he would have gone to trial if he had only

10

had competent counsel. But the court denied his motion to withdraw the plea, stating that "Mr. Bourabah has simply wasted our time today. He has no credible evidence that his plea was not knowing and voluntary. He has no credible evidence that he was legally innocent. In fact, he says he was guilty, just not as guilty as other people think." J.A. 681.

Finally, regarding the sentence, the court heard testimony from some of Bourabah's victims and an FBI agent. Based on that testimony and other evidence offered by the government, the court departed upward by seven levels. Because Bourabah had no other criminal history, the result was a Sentencing Guidelines range of 87 to 108 months' imprisonment. Ultimately, the court sentenced Bourabah to 100 months in prison and three years of supervised release, with restitution to the victims of $22,489.52.

Bourabah timely appealed.

II.

Bourabah raises three issues on appeal: He challenges the denial of his motions for new counsel, the denial of his motion to withdraw his guilty plea, and the procedural and substantive reasonableness of his sentence. We affirm.

A.

First, Bourabah appeals the district court's denial of his motions to withdraw Gantous as counsel after an alleged breakdown in communication between the two. However, in so doing, he stitches together two distinct claims on appeal: (1) that the court abused its discretion in denying the motion to withdraw counsel, and (2) that his plea should be invalidated due to ineffective assistance of counsel.

11

1.

"We review for abuse of discretion a district court's rulings on a motion to substitute counsel." *United States v. Reevey*, 364 F.3d 151, 156 (4th Cir. 2004). In considering a motion to withdraw as counsel, we consider three factors: "(1) the timeliness of [the defendant's] Motions; (2) the adequacy of the court's inquiry into his complaint about counsel; and (3) whether [the defendant] and his counsel experienced a total lack of communication preventing an adequate defense." *Id.* (quotation omitted). We as an appellate court then "weigh[] these factors against the district court's interest in the 'orderly administration of justice.'" *United States v. Perez*, 661 F.3d 189, 191 (4th Cir. 2011) (quoting *Reevey*, 364 F.3d at 157).

Bourabah moved to replace Gantous as counsel twice: once on August 22, 2023, less than a week before trial, and again on May 9, 2024, prior to sentencing. However, Bourabah's Opening Brief, while making passing references to the "motions" to withdraw, solely develops arguments as to the first motion. Opening Br. at 16, 23. As such, he has waived any appeal of the court's decision on the second motion. *United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." (quotation omitted)).

We find no abuse of discretion in the district court's denial of the first motion, filed just prior to trial.

First, the motion was untimely. The trial was set to begin in six days. The court was on the verge of hearing several motions in limine. We have regularly held that motions to

withdraw counsel brought on the eve of trial are untimely. *Compare United States v. Hackley*, 662 F.3d 671, 685 (4th Cir. 2011), *as corrected* (Dec. 20, 2011) (motion to withdraw a week before trial was untimely), *and United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988) (no abuse of discretion in denying motion five days before trial), *with United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014) (motion three weeks before trial was timely), *and United States v. Jennette*, 387 F. App'x 303, 306–07 (4th Cir. 2010) (motion to withdraw two weeks before sentencing was timely). Because we "must . . . be mindful of the court's interest in moving its docket," *United States v. Mullen*, 32 F.3d 891, 895 (4th Cir. 1994), it was reasonable for the district court to conclude that this motion was untimely.

Second, the court's inquiry into Bourabah's complaint about counsel was adequate. At least initially, both parties pressed this particular issue by noting that the magistrate judge could not adequately delve into the communications between Bourabah and Gantous due to privilege issues. To the extent that was true, the problem was cured by the district court when it engaged in an extended *ex parte* colloquy with Bourabah and Gantous. After that discussion, the district court found that the root of the problem was not a breakdown of communication; it was simply that Bourabah disagreed with the advice his attorney was giving him.

Third, the record supports the conclusion that Bourabah and his counsel did not experience a total lack of communication preventing an adequate defense. Bourabah admits that he and Gantous were able to meet to discuss the case up to a dozen different times. Indeed, the root of his complaint was that Gantous *had* communicated to him things he did

13

not want to hear: that Bourabah should plead guilty, that he had no viable defenses, and that Gantous would not file motions or cross-examine witnesses in frivolous ways. That is not a breakdown of communication; it is what we expect of a competent and ethical member of the defense bar.

All three factors therefore weighed in favor of denying the motion. And it is even clearer that the denial was appropriate when those factors are considered in light of the district court's interest in the orderly administration of justice. We are particularly wary of overturning denials that "involve a motion for substitution made shortly before or during trial, multiple substitutions, or both." *Mullen*, 32 F.3d at 897.

Here, the court granted the initial motion to withdraw but warned Bourabah that it was unlikely to do so again. Just a week before trial, with all witnesses scheduled to appear, the defendant came to the court with almost exactly the same complaints about Gantous as he had raised about his prior counsel. The district court was rightly concerned that if it granted this motion, there was nothing stopping the pattern from repeating a third time. *See* J.A. 388 ("[A]t some stage, we'll have a motion to dismiss the third lawyer. I'm afraid of that.").

In all, therefore, it was not an abuse of discretion for the district court to deny the motion to substitute counsel prior to trial.

2.

Bourabah also asserts that the district court's denial of the motion to withdraw violated his "right to the effective assistance of counsel, pursuant to the Sixth Amendment." Opening Br. at 16.

14

"The question of whether trial counsel provided ineffective assistance is a mixed question of law and fact which we review *de novo*." *United States v. Tucker*, 603 F.3d 260, 262 (4th Cir. 2010).

Under the *Strickland* test, "to establish a Sixth Amendment claim for ineffective assistance of counsel a defendant must show (1) objectively unreasonable performance and (2) prejudice stemming from that performance." *United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984)). However, ineffective assistance claims are generally not cognizable on direct appeal "unless it conclusively appears from the record that defense counsel did not provide effective representation." *Id.* (quotation omitted).

Here, Bourabah's ineffective-assistance claim necessarily fails because the record does not conclusively show that Gantous's representation of Bourabah was objectively unreasonable.

Bourabah complains that Gantous failed to offer an expert witness in computer forensics, failed to subpoena records from Google, and failed to ask for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the search warrants in this case. But those decisions were not "objectively unreasonable." *Benton*, 523 F.3d at 435.

Bourabah argues that an expert witness in computer forensics was needed because Gantous admitted in his *ex parte* session with the court that this case involved "a bunch of computer mumbo-jumbo" that he did not understand. J.A. 417. However, Gantous went on to say that "I don't think I need to understand all of that necessarily to understand the case" because the actual content of the communications pulled from the computer searches was

15

"plain as day," was "in plain English," and "sa[id] and describe[d] conduct that . . . implicate[d] [Bourabah] in every way." *Id.* Gantous was not objectively unreasonable in refusing to consult or offer into evidence an outside computer expert.

Bourabah also wanted Gantous to subpoena Google records to show that some email addresses searched by law enforcement were obtained without a valid warrant. Bourabah argued that he had "brought this up with Mr. Gantous on multiple occasions, and I asked him to investigate this, and he refused to investigate this claim that they did things without a warrant." J.A. 396. But that wasn't true: Gantous told the court that he investigated the warrants used to carry out searches of email addresses in this case and that they were all valid. *See* J.A. 414–15 ("Everything pulled off the phone was subject to a warrant or a subpoena. I've reviewed the warrants. I've reviewed the subpoenas. No matter how many times I tell Mr. Bourabah that they are constitutionally valid, he doesn't believe me."). The court was entitled to credit Gantous's explanation.

Similarly, Gantous did not act unreasonably in refusing to ask for a *Franks* hearing on the validity of the search warrants. Bourabah principally argued that the warrants were invalid because the FBI agent had lied on the warrants, including falsely stating that he had joked about ducks and a trampoline, that he ordered DoorDash to people's houses, and that in general he was harassing people. But there was evidence in the record of each of those things. *See* J.A. 1552–53, 1568–70 (duck and trampoline jokes); J.A. 1757 (DoorDash); J.A. 663–64 (admitting in part to harassment).

16

Because the record does not conclusively show that Gantous acted objectively unreasonably in his representation ahead of trial, there was no *Strickland* error. We thus affirm the district court's denial of the motion to withdraw as counsel.

B.

Next, Bourabah appeals the denial of his motion to withdraw his *Alford* plea.

We review the denial of a motion to withdraw a guilty plea, including an *Alford* plea, for abuse of discretion. *See United States v. Morrow*, 914 F.2d 608, 611 (4th Cir. 1990); *United States v. Dyess*, 478 F.3d 224, 237 (4th Cir. 2007). A defendant may withdraw a guilty plea if he "can show a fair and just reason for requesting the withdrawal." Fed. R. Crim. P. 11(d)(2)(B). The defendant "bears the burden of demonstrating that withdrawal should be granted." *Dyess*, 478 F.3d at 237.

We consider six factors in determining whether to permit the withdrawal of a guilty plea, though the list is not exhaustive:

> (1) whether the defendant has offered credible evidence that his plea was not knowing or not voluntary, (2) whether the defendant has credibly asserted his legal innocence, (3) whether there has been a delay between the entering of the plea and the filing of the motion, (4) whether [the] defendant has had close assistance of competent counsel, (5) whether withdrawal will cause prejudice to the government, and (6) whether it will inconvenience the court and waste judicial resources.

*United States v. Moore*, 931 F.2d 245, 248 (4th Cir. 1991).

All six factors support the district court's decision to deny Bourabah's motion. Bourabah admitted to the district court that his "*Alford* plea was knowing." J.A. 681. The district court also found that Bourabah had not credibly asserted his innocence: Bourabah

17

conceded that he was guilty of many of the actions alleged by the government, just not "to the extent [he was] being accused of." J.A. 676. There was a lengthy delay—255 days, or more than eight months—between when Bourabah entered the plea and when he moved to withdraw it. *Cf. Moore*, 931 F.2d at 248 (six weeks was "long delayed"); *United States v. Nicholson*, 676 F.3d 376, 384 (4th Cir. 2012) (two or three months similarly too long). As noted above, the district court did not abuse its discretion in determining that Gantous provided competent counsel. And finally, allowing Bourabah to withdraw his plea would have both prejudiced the government and inconvenienced the court by forcing them to set the case for trial yet again after already preparing for trial once before. *United States v. Bangura*, 765 F. App'x 928, 932 (4th Cir. 2019) ("Prejudice to the Government and a waste of judicial resources are inherent in allowing the withdrawal of a guilty plea.").

Therefore, Bourabah did not meet his burden to demonstrate that he should be permitted to withdraw his *Alford* plea, and the district court did not err in denying his motion.

C.

Finally, Bourabah appeals his sentence.

We review the reasonableness of a sentence under a "deferential abuse-of-discretion standard." *United States v. Friend*, 2 F.4th 369, 379 (4th Cir. 2021) (quotation omitted). Our two-step inquiry asks whether the sentence was (1) procedurally and (2) substantively reasonable. *Id.*

18

1.

In assessing procedural reasonableness, we review whether the district court "committed . . . significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). "In assessing a challenge to a sentencing court's application of the Guidelines, we review the court's factual findings for clear error and its legal conclusions de novo." *United States v. Alvarado Perez*, 609 F.3d 609, 612 (4th Cir. 2010) (quotation omitted).

Here, Bourabah argues that the district court committed procedural error in departing upward under the Guidelines. The court did so under two provisions: U.S.S.G. § 5K2.3 and § 5K2.8.

First, at the time of sentencing,[5] U.S.S.G. § 5K2.3 allowed the court to depart upward "[i]f a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense."

We review for clear error the district court's determination that the psychological injury in this case was sufficiently "serious" under this departure. *Alvarado Perez*, 609 F.3d

---

[5] As of November 2025, the Guidelines were significantly overhauled to eliminate departures altogether. What was once a three-step process (Guidelines calculation, then departures, then variances) has now collapsed to two (Guidelines calculation, followed by variances). *See* U.S.S.G. app. C, amend. 836 (2025). But the two relevant departures existed at the time of Bourabah's sentencing, and we apply the Guidelines in effect at that time. *See Beckles v. United States*, 580 U.S. 256, 259 n.1 (2017).

at 615; *cf. United States v. Lawson*, 128 F.4th 243, 249 (4th Cir. 2025) (classifying a similar vulnerable-victim departure as a "factual determination[]" we review "for clear error"). Indeed, we have noted that "[i]f there is any place in sentencing guidelines analysis where a fact-finder is to be given considerable deference, it is here where the district court is called upon to assess the psychological impact upon victims." *United States v. Gary*, 18 F.3d 1123, 1129 (4th Cir. 1994) (quoting *United States v. Astorri*, 923 F.2d 1052, 1058 (3d Cir. 1991)); *see also United States v. Bartley*, 711 F. App'x 127, 129 (4th Cir. 2017) ("We give 'considerable deference' to a district court's application of an upward departure for psychological injury to a victim." (quoting *Gary*, 18 F.3d at 1129)). We have upheld departures under this Guidelines provision when a victim "was so fearful that she obtained a gun" and "was afraid to leave her house." *Gary*, 18 F.3d at 1129. We've similarly upheld the upward departure when a victim felt compelled "to wear a bullet proof vest and request a job transfer." *Alvarado Perez*, 609 F.3d at 615.

At the sentencing hearing, the district court heard testimony from the victims. At least some of the victims had formal diagnoses of depression and PTSD. They also had "dramatic sleep disturbances," an "inability to concentrate at work," and "constant fear." J.A. 787. Based on that testimony, the court concluded that the impact on the victims exceeded the threshold for extreme psychological injury under the Guidelines. It also found that their impairments were "likely to go on for a while." *Id.*

Giving the appropriate deference to the district court on this point, we find no clear error in its finding that Bourabah's behavior caused the victims extreme psychological injury. We thus affirm the upward departure.

20

The district court also did not clearly err in finding that "the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim[s]." U.S.S.G. § 5K2.8. Here, the victims documented hundreds of instances of harassment that stretched over nearly two years. *Cf. Gary*, 18 F.3d at 1130 (citing "the extended nature" of a defendant's harassment campaign that "prolonged [the victim's] pain and humiliation"). Bourabah "repeatedly engaged in behavior designed to embarrass and humiliate" not just WR herself, but several members of her extended family. *United States v. Taylor*, 88 F.3d 938, 946 (11th Cir. 1996) (upholding application of § 5K2.8 to defendant who sent hundreds of letters to a victim and her employer, sent a stripper to the school where the victim was principal, and offered money to neighbors for nude photos of the victim). And the consequences were severe: The victims had items and animals stolen from their homes, felt the need to erect physical barricades, and even fled temporarily to Florida to escape the worst of the humiliation. It's little surprise, then, that the district court commented that this was "the worst case of cyber harassment [it had] ever seen." J.A. 789.

We see no clear error in the district court's finding that Bourabah's conduct was extreme under U.S.S.G. § 5K2.8.

## 2.

As to the substantive reasonableness of the sentence, a sentence that is "within or below a properly calculated Guidelines range is presumptively reasonable." *United States v. Bennett*, 986 F.3d 389, 401 (4th Cir. 2021) (quotation omitted). On appeal, that "presumption can only be rebutted by showing that the sentence is unreasonable when measured against" the sentencing factors set forth in 18 U.S.C. § 3553(a). *Id.* (quotation

21

omitted). We review the substantive reasonableness of a sentence "with 'due deference' and will only reverse if we find an abuse of discretion." *United States v. Notgrass*, 130 F.4th 129, 142 (4th Cir. 2025) (quoting *Gall*, 552 U.S. at 51).

Bourabah's 100-month sentence was within the Guidelines range after the application of the upward departures and is thus presumptively reasonable. In evaluating the § 3553(a) factors, the district court found, among other things, that the nature of Bourabah's conduct was unbelievably cruel and that the court needed to send a strong signal to deter similar conduct from any other would-be cyberstalkers. We find no abuse of discretion in those findings and therefore affirm the substantive reasonableness of Bourabah's sentence.

3.

Finally, Bourabah challenges the court's award of $22,489.52 in restitution to the victims.

The government bears the burden of proving the appropriate amount of restitution by a preponderance of the evidence. *See* 18 U.S.C. § 3664(e). Restitution awards are subject to both procedural and substantive protections, and we review them for abuse of discretion. *See United States v. Leftwich*, 628 F.3d 665, 667 (4th Cir. 2010).

Bourabah challenges the district court's decision to include expenses for several of the victims' trip to Florida, because the escape was not "required"; attorney's fees "for lack of certainty"; surveillance equipment for any time period after Bourabah was in custody; and SE1's loss of income because it was "uncertain." Opening Br. at 31.

22

But the government put forward evidence to support each of those expenses, and the district court did not abuse its discretion in finding that they were necessary results of the abuse that Bourabah inflicted upon his victims.

We therefore find no abuse of discretion in the court's imposition of restitution.

### III.

For the foregoing reasons, the district court's judgment is affirmed.

*AFFIRMED*